**UNITED STATES of America, Plaintiff–Appellee,**

**v.**

**Barry KEETER, Darres Park, and Paul D. Ahrens, Defendants–Appellants.**

**Nos. 96–3284, 96–3932 and 97–1150.**

United States Court of Appeals, Seventh Circuit.

Argued Oct. 27, 1997.

Decided Nov. 24, 1997.

Timothy M. O'Shea (argued), Office of the United States Attorney, Madison, WI, for Plaintiff–Appellee in Nos. 96–3284 and 96–3932.

Peggy A. Lautenschlager, Timothy M. O'Shea (argued), Office of the United States Attorney, Madison, WI, for Plaintiff–Appellee in No. 97–1150.

R. Alan Bates (argued), Feingold, Bates & Sultze, Janesville, WI, for Barry Keeter.

Stephen J. Meyer (argued), Madison, WI, for Darres Park.

Gary Seeling (argued), Waukesha, WI, for Paul Ahrens.

Before CUMMINGS, EASTERBROOK, and ROVNER, Circuit Judges.

EASTERBROOK, Circuit Judge.

Last year we affirmed the sentence of a federal prisoner who smuggled amphetamine into prison so that other inmates could raise money to pay off gambling debts. *United States v. Hall,* 101 F.3d 1174 (7th Cir.1996). Now we have the appeals of three other participants in the scheme: Darres Park, the prison bookie; Barry Keeter, a losing gambler who thought up the scheme and resold within the prison the drug that Hall carried; and Paul Ahrens, another unsuccessful gambler who, after his release from prison, supplied the drug to Hall (via Hall's girlfriend). Keeter and Park received modest sentences (less than three years) for their roles; Ahrens was sentenced as a career offender to 88 months, a term substantially reduced by a seven-level reduction for assistance to the prosecution.

Keeter pleaded guilty and asked for a lower sentence under U.S.S.G. § 3E1.1. The judge was more impressed, however, by Keeter's threat to kill a witness. Suspecting that another inmate had provided information to the authorities, Keeter sent this message through an intermediary: "Hope you like this card you no-good snitching punk bitch mother-fucker. One day you'll get yours just like Pat Bell + Connie. See you later punk". This threat, coupled with Keeter's efforts to get two other persons to sign false statements, led to an enhancement for obstruction of justice under U.S.S.G. § 3C1.1. "Conduct resulting in an enhancement under § 3C1.1 ... ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct. There may, however, be extraordinary cases in which adjustments under both §§ 3C1.1 and 3E1.1 may apply." U.S.S.G. § 3E1.1 Application Note 4. The judge thought that there was nothing "extraordinary" about Keeter's case, and given deferential appellate review (*Koon v. United States,* — U.S. —, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996); *United States v. Yusuff,* 96 F.3d 982, 989 (7th Cir.1996)), it is impossible to gainsay that conclusion. See *United States v. Gomez,* 24 F.3d 924, 926 (7th Cir.1994). The only supposedly exceptional circumstance is that Keeter did not commit any additional crimes (at least, was not detected committing any) during the 9-month period between release from his old term of imprisonment and his incarceration for smuggling methamphetamine. Why 9 months of law-abiding conduct should be deemed so "extraordinary" that it purges the taint of the obstruction eludes us. Keeter is a career offender who appears to pose a substantial risk of recidivism, and a district judge rationally could conclude that he should not receive a benefit designed for offenders whose guilty pleas imply that the probability of their committing new crimes is low.

Ahrens also pleaded guilty. Although as part of the plea bargain the prosecutor offered to ask the judge to reduce the sentence for substantial assistance, Ahrens wanted to receive his discount from a lower retail price. His convictions marked him as a career offender who normally would be sentenced at the top of the range for persons with the most extensive criminal history. U.S.S.G. § 4B1.1. Seeking to avoid the career-offender designation for his client, attorney Peter A. Vance of San Diego (who appeared in the Western District of Wisconsin *pro hac vice*) secured a three-month delay in sentencing so that he could initiate a *coram nobis* proceeding to have one of Ahrens' state convictions annulled. When the day of sentencing arrived, attorney Vance revealed that the trial court in California had declined to upset the conviction, and he asked for more time to pursue an appeal. The district court thought the prospects of an appeal dim and denied the request. At this point Vance revealed that he was not ready to represent Ahrens at sentencing—although he had not sought a continuance in advance despite having ample notice of the date set for sentencing.

Appalled by Vance's indifference to the costs that unpreparedness imposes on the prosecutor, defendant, and court, the judge bawled out Vance and ordered him to refund part of his fee. Then she offered Ahrens three choices: (i) proceed immediately to sentencing with Vance as his lawyer; (ii)

represent himself at sentencing; or (iii) fire Vance and engage a new lawyer in preparation for sentencing in a month's time. Waiting a month and then proceeding with Vance was out of the question; the court was reluctant to let counsel help himself to a continuance and was unwilling to take the risk that Vance would be unprepared a second time. After Ahrens expressed hesitation about which path to follow, the judge took a recess so that Ahrens could consult with Vance. Back in court, Ahrens elected to proceed immediately with Vance as his lawyer. He reiterated this position several times after the judge gave him an opportunity to change his mind. Vance then argued for a downward departure from the Guidelines for three principal reasons: Ahrens' cooperation with the prosecutor; the fact that other defendants had received much lower sentences than the one facing Ahrens; and the events leading to a conviction in Colorado (another of the crimes that led to the career-offender designation). According to Vance, Ahrens' lawyer in yet another case induced him to commit a drug offense in order to raise money to pay legal fees; the transaction this lawyer encouraged Ahrens to undertake led to the Colorado conviction. The district court agreed with the first ground for departure (which the prosecutor supported) and reduced Ahrens' offense severity by seven levels. The other two the judge found unimpressive.

Represented by new counsel, Ahrens contends that the judge should not have sentenced him, represented as he was by an unprepared lawyer. Vance disserved both his client and the judicial system by asking on the spot for a continuance, without being ready in the event the request should be denied. But the opportunity Ahrens now asks us to provide—a hearing with the aid of a fully prepared lawyer—was one of the options the district judge extended. Ahrens said that he preferred immediate sentencing with Vance's assistance. It is impossible to say that the judge erred in giving Ahrens what he wanted. No criminal defendant may avoid an explicit waiver, unless the waiver was involuntary. *United States v. Olano,* 507 U.S. 725, 733, 113 S.Ct. 1770, 1777, 123 L.Ed.2d 508 (1993). A claim that has been waived "is not reviewable, even for plain error", because the waiver means that there has been no error at all. *United States v. Penny,* 60 F.3d 1257, 1261 (7th Cir.1995); *United States v. Ross,* 77 F.3d 1525, 1541–42 (7th Cir.1996).

Well, then, was Ahrens' choice involuntary or coerced? How could it be? The judge offered him time for reflection and verified, during a colloquy in open court, that the choice was genuine. Election among well-understood alternatives meets the most stringent definition of voluntariness. The district court made it clear to Ahrens that Vance was unprepared; when electing to proceed with Vance anyway, Ahrens knew more about his lawyer's likely performance than litigants do when they choose representatives initially. Although the district judge implied to Ahrens that immediate sentencing would be in his best interests—in part because that would enable him to move more quickly from the county jail to federal prison, and in part because it seemed unlikely that delay would lead to a lower sentence—this does not call the voluntariness of the choice into question. Police who make it clear that they want a suspect to come clean do not render the confession involuntary. Prosecutors may offer strong inducements, such as reduced charges or immunity for family members, to elicit confessions or guilty pleas. *Johnson v. Trigg,* 28 F.3d 639 (7th Cir.1994). Judge Crabb offered nothing but earnest advice. Immediate sentencing *did* enable Ahrens to move from the local jail, with its paucity of recreational and training opportunities, to the federal prison. The judge could not have delayed the sentencing yet transferred Ahrens to prison; delay meant staying put.

Even with the benefit of hindsight, it is not clear what delay could have achieved. Ahrens' current lawyer has not improved on the arguments Vance made off the cuff. Any contention that the difference between Ahrens' sentence and that of the other defendants could support a downward departure has been squelched by *United States v. Meza,* 127 F.3d 545 (7th Cir.1997), which holds that a disparity caused by correct ap-

plication of the Guidelines never may be the foundation for a departure. Ahrens received a higher sentence than his co-defendants for two reasons: first, he is a career offender; second, the Guidelines treat drug distribution by someone outside prison more severely than they treat the importation of drugs by prisoners into the institution. A more serious offense by someone with a bad criminal history produced the longer sentence even after the discounts for pleading guilty and assisting the prosecutor. *Meza* shows that the district judge would not have been authorized to grant a further departure on account of the residual difference. As for the argument that "imperfect duress" (that is, the lawyer's influence) in the circumstances of one prior offense could have supported a departure: Vance did not provide evidence to support his submission about the attorney's conduct in the Colorado case, but it was not for want of proof that the contention failed. Ahrens does not reckon with the principle that district judges take criminal records at face value. Cases such as *Custis v. United States,* 511 U.S. 485, 114 S.Ct. 1732, 128 L.Ed.2d 517 (1994); *Taylor v. United States,* 495 U.S. 575, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990); and *United States v. Shannon,* 110 F.3d 382 (7th Cir.1997) (en banc), show that district judges should not (and often may not) investigate the circumstances leading to prior convictions. The career-offender guideline and recidivist statutes use the identity of the prior crimes, rather than the facts leading to conviction, as the basis of enhancement. Looking behind the judgments would complicate sentencing without offering much of value to defendants. A person who has been induced to commit one crime, as Ahrens says he was by his ex-attorney, may avoid recidivist sentencing by refraining from new crimes. By continuing on a criminal career, Ahrens demonstrated that his Colorado conviction was not an isolated event for which his lawyer could be blamed; he was and remains willing to take available criminal opportunities. Departure would undermine the objectives of the Guidelines.

Although a delay seemed to hold little prospect of benefit for Ahrens, a legal rule that when the attorney is unprepared the court *must* delay sentencing would create substantial prospect of mischief. For one thing, it would give defendants and their lawyers veto power over the timing of sentencing. They could obtain delay by self-help measures. For another, it would induce judges to deprive defendants of a valuable right: the right to choose how (if at all) they will be represented. Any defendant is entitled to be his own lawyer, see *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), and a solvent defendant (which Ahrens was) also is entitled to substantial latitude in choosing among lawyers. See *Wheat v. United States,* 486 U.S. 153, 159, 108 S.Ct. 1692, 1697, 100 L.Ed.2d 140 (1988). That implies the right to select a lawyer laboring under a conflict of interest, provided only that the defendant has enough information to make an intelligent decision. *Holloway v. Arkansas,* 435 U.S. 475, 483, 98 S.Ct. 1173, 1178, 55 L.Ed.2d 426 (1978); *United States v. Roth,* 860 F.2d 1382 (7th Cir.1988). Because the reason why conflicts are troubling is that the lawyer may supply a lower quality of representation, the right to tolerate a conflict implies a right to accept a (known) low quality of service. Defendants may opt for lawyers from the bottom 10% of the distribution. So Ahrens had a range of choices: represent himself; be represented by a poor lawyer; or wait and be represented by a better lawyer. He was constitutionally entitled to select the option he deemed best. Yet in this court Ahrens argues that the district judge was obliged to rule out the first two options and impose the third. Had the judge refused to respect his actual choice (sentencing at once, with Vance's aid), Ahrens doubtless would complain that the judge deprived him of his right to the assistance of his chosen counsel. And he would be right. The district judge offered the necessary trio of options, and Ahrens cannot now insist that the judge was obliged to reject the choice he made. Ahrens was entitled to pick *one* of the options, not to try all three in sequence and take the lowest sentence.

Park, the third of the defendants, was convicted by a jury. Park's principal argument arises from the appearance of Paul Long, an inmate who may have helped the

conspirators' efforts to cover their tracks after Hall went into convulsions from an overdose of methamphetamine. Long told investigators that Park asked him to send drug-related messages to Ahrens and Hall's girlfriend. Long signed an affidavit containing details that incriminated Park; before the grand jury Long reiterated the contents of the affidavit. But after word circulated that Long was cooperating, he began to fear that the government could not protect him from retaliation. Long told an agent that he would no longer assist prosecutors and, if called, would testify that he had forgotten everything. On the witness stand in Park's trial, Long did exactly that. He claimed inability to remember anything except his name. He "could not recall" meeting with Park, passing any messages, providing the facts in the affidavit, or even appearing before the grand jury. At this point the prosecution offered Long's affidavit and grand jury testimony as substantive evidence under Fed.R.Evid. 801(d)(1), which says that a statement is not hearsay if "[t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition".

As Park sees things, a witness who feigns amnesia is not "subject to cross-examination"—which Park believes not only precludes use of Rule 801(d)(1)(A) but also creates a violation of the sixth amendment's confrontation clause. *United States v. Owens,* 484 U.S. 554, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988), disposes of both variations of the argument. After the victim of a crime identified the assailant, he was unable to recall the events of the crime. The prior identification was admitted under Rule 801(d)(1)(C). Because the victim was open to cross-examination, the Court held that this use of the prior statement satisfied both the rule and the Constitution, even though the victim could no longer remember the crime or identify the assailant. Park tells us that the victim in *Owens* had genuine rather than feigned amnesia, and could at least remember making the identification (which Long purported to be unable to do), but neither difference matters. The Supreme Court's point was that the confrontation clause (and the rule) are satisfied when the witness must look the accused in the eye in court; shortcomings in the declarant's memory may be made known to the jury. See also Akhil Reed Amar, *The Constitution and Criminal Procedure* 125–31 (1997). Park had a much easier time of things than Owens, whose accuser was impervious to effective cross-examination. Long, by contrast, was a blatant liar—someone whose oath meant nothing to him, who was willing to say whatever was most advantageous at the moment. When he sought personal benefit from assisting the prosecutor, he accused other inmates of crimes; when he sought personal benefit by deflecting other inmates' anger, he told whatever lie was most useful. That enabled counsel to ask the jury how reliable Long's out-of-court statement could be, given that Long was willing to lie to the jurors' faces. How much more thoroughly could a witness's credibility be destroyed? The opportunity for confrontation conferred greater benefits on Park than on Owens. If what Owens received was enough, then what Park received was enough.

A few other arguments have been advanced and considered, but they do not require comment.

AFFIRMED.