In the

# United States Court of Appeals
## For the Seventh Circuit

No. 04-1324

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JASON BEST, a/k/a JBOO,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 00 CR 171(1)—**Rudy Lozano**, *Judge.*

ARGUED APRIL 6, 2005—DECIDED OCTOBER 24, 2005

Before BAUER, RIPPLE, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* After a few false starts with appointed counsel, Jason Best decided that he wanted to represent himself at his trial on federal drug charges. The district court permitted him to do so, after warning him of the difficulties he faced and finding that his waiver of counsel was knowing and intelligent. Best began his trial acting as his own advocate. On the morning of the second day, however, he changed his mind and asked the court to reinstate his attorneys; the court did so. The jury went on to convict Best of one count of conspiracy to distribute more than 50 grams of crack cocaine in violation of 21 U.S.C. § 846, two counts of possession with intent to distribute crack cocaine in violation of 21 U.S.C. § 841(a)(1), and two counts

of maintaining a place for distribution of crack cocaine in violation of 21 U.S.C. § 856(a)(1). The court sentenced Best to life imprisonment.

In this appeal, Best attacks the court's initial acquiescence in his motion to waive his right to counsel, as well as the court's decision to continue with prior counsel for the balance of the trial and sentencing. Best also argues that he is entitled to be resentenced, because his sentence violates the principles announced in the Supreme Court's decisions in *Blakely v. Washington,* 124 S.Ct. 2531 (2004) (which had been decided by the time his opening brief was filed) and *United States v. Booker*, 125 S.Ct. 738 (2005) (which appeared prior to oral argument). We affirm Best's conviction and order a limited remand of Best's sentence under the terms set forth in *United States v. Paladino*, 401 F.3d 471, 483-84 (7th Cir. 2005), for a determination whether the district court would impose a different sentence under the now-advisory Guidelines.

# I

Best was involved in a crack cocaine distribution operation in Gary, Indiana, from 1997 to 2000. He ran at least six drug houses, supplying crack and marijuana, hiring and paying dealers, scheduling work shifts, and picking up the profits at the various locations. In 1997, the Gary Response Investigative Team (GRIT), a federal drug task force that included Gary police officers, began investigating drug activity in the Bronx area of Gary. GRIT arranged for several controlled buys at various drug houses. As a result of these buys, the police arrested several of Best's associates, who agreed to cooperate in the government's investigation.

On November 9, 1997, three police officers followed Juble Hairston, a suspected drug dealer, to 532 Hovey Street. Hairston entered the house and shut the door. The officers

knocked and asked to enter the home. After a few minutes, Best's cousin opened the door and let the officers in. Upon their entry, the agents found seven to eight men including Best and Hairston. They also found crack cocaine, a scale, beakers, and plastic bags. After conducting a protective sweep of the home, they recovered two shotguns, three handguns, and an assault rifle. The agents also found $1,293 in Best's pocket.

On November 21, 1997, the GRIT officers spotted Garrett Smith, who they knew had an outstanding murder warrant, on the porch at 532 Hovey Street. Smith retreated into the home. Fearing for the occupants' safety, the agents followed him, forcing entry. There they found 35.7 grams of crack, ammunition, scales, and plastic bags. Best was once again on the scene, this time with $1,500 in his pocket. According to the testimony of Best's accomplices, Best then moved his operations to various other locations in Gary including 1536 Jackson Street and 798 Porter Street.

On October 17, 2000, a grand jury indicted Best along with five other individuals for their involvement in distributing and selling crack cocaine. The court appointed Clark W. Holesinger to represent Best. On January 19, 2001, a superseding indictment charged Best with nine counts related to his drug activities, one count for murder during the course of the drug conspiracy in violation of 18 U.S.C. §§ 924(j) and 924(c)(1), and one count for being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). At that point, the court appointed co-counsel for Best, attorney Gary S. Germann. By February Best had grown dissatisfied with his counsel. He wrote a letter to Judge Lozano requesting the appointment of new counsel. But on February 14, 2001, Magistrate Judge Rodovich held a hearing at which Best indicated that he was pleased with Holesinger; Judge Rodovich accordingly denied Best's motion. Tensions evidently continued, however. On September 25, 2001, Germann moved to withdraw from represent-

ing Best. The court granted his motion and appointed Thomas W. Vanes to replace him. Shortly thereafter, the government filed notice that it intended to seek the death penalty on the murder count. Judge Lozano reset the date for Best's trial for April 2002.

On November 26, 2001, Best sent another letter to Judge Lozano complaining that Holesinger was afraid of the prosecutor and that his counsel was not listening to him. Best indicated that he wanted to represent himself with the help of Vanes or have the court appoint an attorney from outside the area to represent him. On December 6, 2001, Judge Rodovich held another hearing on the matter, and once again, Best stated that he was satisfied with Holesinger's representation.

The court set March 1, 2002, as the deadline for all pre-trial motions. Best's lawyers failed to get their motions in on time. They did, however, file a motion to sever the murder and felon-in-possession counts from his drug charges, which the court granted on May 28, 2002. At the same time, it set July 15, 2002, as the start date for the trial on the drug charges. On June 21, 2002, less than a month before the trial was scheduled to begin, counsel asked for leave to file late motions to suppress on Best's drug charges. The reason they gave for their tardiness was their preoccupation with Best's death penalty charge, which they had successfully managed to sever from the drug case just a few weeks earlier. Judge Lozano denied their motion.

On July 12, 2002, Best sent another letter to Judge Lozano indicating that he wished to proceed *pro se*. Just before trial was to start on the 15th, Judge Lozano himself held a hearing on Best's renewed request. At the hearing, Judge Lozano asked about Best's legal knowledge and skills. He specifically quizzed Best on his knowledge of the Federal Rules of Evidence, the Federal Rules of Criminal Procedure, the Federal Sentencing Guidelines, and the law.

In addition, he repeatedly warned Best of the dangers of self-representation and the exposure he faced on his upcoming death penalty trial. Before accepting Best's waiver, he warned:

> Mr. Best, I must advise you that, in my opinion, you would be far better defended by a trained lawyer who is accredited by a State Bar Association and by the state itself, than you could be by defending yourself. I think that it is unwise for you to try to represent yourself. You are not familiar with the law sufficient [*sic*] to defend yourself. You are not familiar with the Court's procedures sufficient [*sic*] to defend yourself. You are not familiar with the Rules of Evidence sufficient [*sic*] to defend yourself. I would strongly urge you not to try to represent yourself.

The judge then asked whether Best was making his decision "entirely voluntarily and knowingly." After Best repeatedly responded that he understood the implications of his decision, the court found that Best "knowingly and voluntarily waived his right to counsel" and permitted Best to represent himself. It then appointed Holesinger and Vanes to serve as standby counsel.

Best quickly became disillusioned with self-representation. He handled the case only during the selection of the jury and the first day of trial. On the morning of the second day, he asked the court to reinstate Vanes and Holesinger. Unenthusiastic, the two lawyers immediately filed a motion to withdraw and a motion for a mistrial. Vanes explained that the restraints that the court had imposed on them in their role as standby counsel had made effective representation impossible. They also complained that the first day of trial had irreversibly harmed Best's case in a number of ways: the government had introduced evidence about the November 9, 1997, search of 532 Hovey Street despite the fact that the court had sustained Best's objection based on

the lack of a search warrant; GRIT supervisor Mark Becker was permitted to testify that GRIT was involved in drug and gang investigations; and Best failed to object when Gary Police Officer Troy Campbell testified that a certain exhibit was an accurate copy of Best's parole ID card with the exception of certain redactions, which was a veiled reference to Best's criminal history. Notwithstanding both the lawyers' objections and Best's, the court reinstated Vanes and Holesinger as Best's counsel and proceeded with the trial. On July 23, 2002, the jury convicted Best on five of the seven counts.

On August 26, 2002, Best filed a *pro se* motion for a new trial, claiming that Vanes and Holesinger had rendered ineffective assistance of counsel. Best complained that they had failed to investigate and call witnesses whom Best had identified; they had failed to file timely motions to suppress; and they had failed to object to the indictment, jury instructions, and verdict form for not including a specific drug quantity. Judge Lozano held a hearing on August 30, 2002, at which he inquired into Best's allegations. Holesinger and Vanes offered strategic reasons for most of the decisions Best had mentioned. For example, they did not call the witnesses that Best had named because they thought it was a bad idea to have individuals who were incarcerated testifying on his behalf. Their defense strategy was instead to try to impeach the government's witnesses, who were all incarcerated, many in the same location. Best's lawyers hoped to show that the government's witnesses had concocted stories against Best. They admitted, however, that Juble Hairston and Garrett Smith could have served as witnesses for the motions to suppress had they filed timely motions.

On September 6, 2002, the court ordered counsel to file post-trial motions to suppress. On September 11, Vanes and Holesinger filed a second motion to withdraw, claiming that

their testimony at the August 30 hearing created an irreconcilable conflict with Best. On October 3, 2002, after another hearing, the court concluded that counsel could continue to represent Best adequately. The suppression hearing took place on November 1 and 15, 2002; a year later, on November 26, 2003, the court denied those motions.

On December 1, 2003, the court held Best's sentencing hearing. Best complained to the court again about his lawyers and asked the court to appoint substitute counsel. The court refused, instead giving Best the choice of proceeding *pro se* or staying with Vanes and Holesinger. Best decided to proceed with them, although he felt that the court had put him to an unfair choice. The court imposed a life sentence on Count One, 240 months' imprisonment on Count Two, 480 months on Count Three, and 240 months each on Counts Seven and Eight, with all terms to be served concurrently.

## II

We begin with Best's claims about his representation at trial, which relate to the court's initial decision to allow him to represent himself, the effectiveness of appointed counsel at the trial stage, and the court's refusal to appoint substitute counsel for the sentencing hearing.

The Supreme Court has held that a defendant has the right under the Sixth Amendment to waive his right to counsel and proceed *pro se. Faretta v. California*, 422 U.S. 806, 819 (1975). Nonetheless, a defendant is normally ill-advised to avail himself of that right, given how difficult it is to face an experienced prosecutor and navigate the complexities of both criminal procedure and criminal law. "Because of the importance of the right to counsel in our constitutional scheme, we do not lightly conclude that a defendant has waived his right to counsel. Accordingly, we

will indulge every reasonable presumption against the waiver." *United States v. Sandles*, 23 F.3d 1121, 1125-26 (7th Cir. 1994) (internal citations and quotation marks omitted). In the end, however, we must uphold a defendant's waiver of counsel if it was knowing and intelligent. *Id.* at 1126.

In reviewing whether a criminal defendant's waiver of the right to counsel was knowing and intelligent, we consider four factors: "(1) whether and to what extent the district judge conducted a formal inquiry; (2) other evidence in the record that establishes whether the defendant in fact understood the dangers and disadvantages of self-representation; (3) the background and experience of the defendant; and (4) the context of the defendant's decision to proceed *pro se.*" *Sandles*, 23 F.3d at 1126. See also *United States v. Egwaoje*, 335 F.3d 579, 585 (7th Cir. 2003).

Here, the first factor—whether the court conducted a formal inquiry into Best's waiver—points strongly toward a finding that the waiver was knowing and intelligent. The district judge carefully followed the model inquiry from the Benchbook for U.S. District Court Judges (4th ed. 1996, with 2000 rev.), as he conducted the required inquiry. Although this court has held that it is not strictly necessary to follow the Benchbook, see *Egwaoje*, 335 F.3d at 585 (affirming our holding in *United States v. Moya-Gomez,* 860 F.2d 706, 732-33 (7th Cir. 1988), and rejecting a rule compelling the adoption of the model inquiry set forth in the federal Benchbook), it was certainly a sound approach for the judge to take. Compare *United States v. McDowell*, 814 F.2d 245, 249-50 (6th Cir. 1987) (requiring that district courts use the model inquiry or "one covering the same substantive points" on the record to determine whether a defendant's waiver is knowing and intelligent).

At the July 15, 2002, hearing, Judge Lozano asked Best

specific questions about his knowledge of the law, the Federal Rules of Evidence, the Federal Rules of Criminal Procedure, and the federal Sentencing Guidelines. He also warned Best about ways in which his first trial might implicate his second trial, in which the government was seeking the death penalty. For example, he pointed out that "in your questioning you might by accident acknowledge something that you may not want to acknowledge, or the witness may say something in which you have not been able to cross-examine properly, and you will be stuck with that answer."

Best now argues that the court's inquiry was inadequate because it failed to explore his educational background, and if it had done so, it would have learned that he had only a GED. But this one omission by the court does not automatically render the inquiry insufficient. Taken as a whole, the record shows that the court's inquiry into Best's knowledge and decision to waive his right to counsel was more than adequate. See also *United States v. Bell*, 901 F.2d 574, 579 (7th Cir. 1990) (finding that the defendant knowingly and intelligently waived his right to counsel even though the magistrate's warnings on the dangers of self-representation were inadequate).

The second factor we evaluate is whether the defendant understood the danger and disadvantage of self-representation. In other cases we have found that a defendant's admission of lack of legal expertise, along with evidence that former counsel warned the defendant of the "pitfalls of self-representation" and "obvious reliance on standby counsel during trial," are factors that weighed in favor of finding waiver. *Sandles*, 23 F.3d at 1128. Several of those factors exist here.

Best relied on his standby counsel during jury selection and in presenting a challenge to the venire. He mentioned that he did not prepare the motion to quash the petit jury

venire. At that point, however, the court warned Best that it would not allow "hybrid representation" and again warned Best of the "drawbacks" of self-representation. After a brief recess for Best to meet with his standby counsel, Best decided to remain *pro se*. During the first day of trial, Best made several statements to the jury that almost bragged about his lack of legal skill. In his opening statement, Best announced:

> This ain't my bag. He's a prosecutor, he's trained to try trials. This is my first time ever. I don't even basically know what to say, but I have two great attorneys over there, but this is so—I feel it's so simple—it's so complicated that it's simple. My attorneys don't know.

Best went so far as to request a cautionary instruction telling the jury not to hold his self-representation against him. Finally, of course, by the morning of the second day of trial Best asked the court whether it was "possible [for him] to go back to [his] attorneys." We find that the second factor also weighs in favor of finding that Best understood the risk he faced in representing himself.

Next, we consider Best's background and experience including "educational achievements, prior experience with the legal system (including prior *pro se* representation), and performance at trial in the case at bar." *Sandles*, 23 F.3d at 1128. The court inquired into Best's legal education, but it did not investigate his general education level. It now appears that Best has a GED, no college education, and a legal education limited to 18 months of study with jailhouse lawyers while he was incarcerated at the MCC. He had never represented himself in a prior legal proceeding.

Best did not do well while he was representing himself, as his lawyers pointed out when they moved to withdraw rather than be reinstated as counsel. He did not raise important objections to Officer Campbell's testimony about

Best's parole ID card, Officer Becker's reference to gang activity, and he allowed the government to proceed through a sustained objection on a Fourth Amendment violation. The combination of his lack of experience representing himself, his relatively limited educational background and knowledge of the law, and whatever hindsight we legitimately can glean from his actual performance at trial weigh against finding that he knowingly and intelligently waived his right to the assistance of counsel.

Finally, the context of Best's decision to proceed *pro se* is important. Best appears to have been a difficult client; at the very least, it is clear that he had a contentious relationship with his lawyers for virtually the entire duration of the proceeding. While Best's position was not always consistent, he repeatedly complained about their representation of him and requested the court to appoint new counsel for him. The district judge was in a better position to evaluate Best's motives than we are. The judge's conclusion that Best had knowingly and intelligently opted for the lesser of two evils—self-representation as opposed to the lawyers he so disliked—was a reasonable one. Evaluating this record as a whole, we find that it demonstrates Best's knowing and intelligent waiver.

### III

Next, Best contends that he received ineffective assistance of counsel at both the guilt phase and the sentencing phase of the trial. We consider first his arguments relating to the guilt phase, and then his sentencing arguments relating to the assistance of counsel.

### A

At the guilt phase, Best's lawyers presented only one testifying witness on his behalf, and they failed to investi-

gate other witnesses Best identified for them, particularly a number who were present during the raids on the alleged drug houses.

Normally, we do not review ineffective assistance of counsel claims on direct review. There is an exception to that rule, however, for cases in which the defendant's claim "can be fully evaluated only on the record below, [ ] and not extrinsic evidence." *United States v. Holman*, 314 F.3d 837, 839 (7th Cir. 2002). Here, the district court permitted a full post-trial hearing on the question whether Best's lawyers were ineffective, in response to his *pro se* motion for new trial. This is therefore the exceptional case where the record permits us to reach the question now.

Under the familiar *Strickland* standard, Best must show that his counsels' performance was deficient and that the deficient performance resulted in prejudice. *Strickland v. Washington*, 466 U.S. 668, 688, 692 (1984). We review those two questions *de novo*. *Holman*, 314 F.3d at 839. To establish that counsels' performance was deficient, Best must show that it fell below an "objective standard of reasonableness." *Strickland*, 466 U.S. at 688. "Our review of the attorney's performance is highly deferential and reflects a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Davis v. Lambert*, 388 F.3d 1052, 1059 (7th Cir. 2004) (quoting *Strickland*, 466 U.S. at 689 (internal quotation marks omitted)). To establish prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

A lawyer's failure to investigate potential defenses may constitute deficient performance under *Strickland*. See *Strickland*, 466 U.S. at 691; see also *Lambert*, 388 F.3d at 1062 (holding that petitioner's claim that defense counsel failed to investigate witnesses met the performance element of *Strickland*); *Washington v. Smith*, 219 F.3d 620, 630-31 (7th Cir. 2000) (finding defense counsel's investigation of one of fourteen witnesses satisfied the performance element for an ineffective assistance of counsel claim). Nevertheless, as we have recognized, "[a] lawyer's decision to call or not to call a witness is a strategic decision generally not subject to review. The Constitution does not oblige counsel to present each and every witness that is suggested to him." *United States v. Williams,* 106 F.3d 1362, 1367 (7th Cir. 1997) (internal citation and quotation marks omitted). If counsel has investigated witnesses and consciously decided not to call them, the decision is probably strategic. An outright failure to investigate witnesses, however, is more likely to be a sign of deficient performance. See *Rompilla v. Beard*, 125 S.Ct. 2456, 2466 (2005) ("It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction.") (quoting 1 ABA Standards for Criminal Justice 4-4.1 (2d ed. 1982 supp.)). Whether deficient performance occurred, however, depends on factors like counsel's overall diligence, the likely relevance of the witness's testimony, whether alternative ways of proving the point exist, and the strength of the government's case. Compare *Washington*, 219 F.3d at 630-32 (finding that failure to investigate or call witnesses where "[counsel] admitted that he did no investigating because of the 'late date' and because he was 'busy trying the case'" was deficient and prejudicial) with *Williams,* 106 F.3d at 1367 (in a felon-in-possession case, counsel's failure to call alibi witnesses where the government had proved each element of the crime was not deficient performance).

Best provided a list of names of all the individuals who were present during the two raids at the house on Hovey Street and were allegedly part of the crack distribution ring. Best's lawyers testified that they attempted to contact the witnesses, but only one responded, Garrett Smith. Moreover, counsel did not receive the names from Best until after the time for filing motions to suppress had expired. When they met with Smith, he told them in the presence of his counsel that he would testify that the police had no idea who he was. Instead, he said, when the police arrived at 532 Hovey Street on November 21, 1997, they came with dogs and arrested everyone in the home and only later learned of Smith's identity and his arrest warrant. This testimony would have conflicted with testimony from the police officers that they had followed Smith into the home because they knew there was a murder warrant out for his arrest, and this was enough to support the conclusion that exigent circumstances permitted them to enter the home.

Under the circumstances, Holesinger explained, he and Vanes concluded that Smith would not be a useful witness for Best at the trial, even if he could have helped with the motion to suppress. They believed that the jury would not "appreciate necessarily the niceties of Fourth Amendment litigation." Furthermore, nothing Smith was prepared to say would have cast any doubt on Best's connection to the drugs and money found at the house. With this in mind, they made the strategic decision not to call Smith at Best's trial.

Holesinger also testified that Juble Hairston was "first and foremost a potential witness for any motion to suppress." Holesinger attempted to contact Hairston before trial, but he was unsuccessful. Hairston, the individual whom the police followed to the Hovey Street house on November 9, 1997, eventually testified on behalf of Best at the post-trial suppression hearing.

In addition, Best wanted counsel to call Radar Tyler, who

(according to Best) wrote a letter on behalf of Quincy Jamison, one of Best's accomplices who testified for the government. Counsel described their decision not to call Tyler as strategic and said that they were able to prove on cross examination that Jamison was not able to read or write and could not have written the letters himself.

Best's counsel claimed that they did not call other witnesses who were present during the raids because they were incarcerated and the lawyers did not want witnesses "wearing jumpsuits" to testify on Best's behalf. They thought that this would undermine their defense strategy, which again was to discredit the government's witnesses as all being incarcerated together and "concocting up stories together" against Best.

Taken together, these are not the strongest strategic justifications we have seen for presenting such a skimpy defense. The problem is less with who was called than it is with who was investigated. Few decisions not to present testimony can be considered "strategic" before some investigation has taken place. As we explained in *United States ex rel. Hampton v. Leibach*, 347 F.3d 219 (7th Cir. 2003), "strategic choices made after *less than complete* investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 247 (quoting *Strickland*, 466 U.S. 690-91) (emphasis added). "Though there may be unusual cases when an attorney can make a rational decision that investigation is unnecessary, as a general rule an attorney must investigate a case in order to provide minimally competent professional representation." *Crisp v. Duckworth*, 743 F.2d 580, 583 (7th Cir. 1984).

We need not decide, however, whether this performance was so deficient that it flunks the first part of the *Strickland* test, because Best cannot show that he was prejudiced by any or all of these problems. The government had

overwhelming evidence of Best's guilt, including 21 witnesses testifying that Best was involved in selling and distributing crack. The government's witnesses gave detailed accounts of Best's involvement in supplying and organizing crack distribution in Gary. For example, Quincy Jamison described himself as a "minor worker" for Best. Jamison testified that Best paid him $1,000 a week to sell crack for three eight-hour shifts at 1536 Jackson Street. During the two raids at Hovey Street, the agents found Best in the presence of crack and firearms with large sums of cash on his person. Therefore, Best cannot show a reasonable probability that the outcome of his trial would have been different had the lawyers done exactly what he wished.

**B**

Best also complains that he received constitutionally ineffective assistance of counsel during the sentencing proceeding. He focuses his appeal, however, on the court's denial of his request to appoint substitute counsel, rather than on the performance rendered by the lawyers he had. We review the denial to appoint substitute counsel for an abuse of discretion. *United States v. Bjorkman*, 270 F.3d 482, 500 (7th Cir. 2001).

In determining whether the district court abused its discretion in denying such a motion, we have structured our inquiry around three non-exclusive factors: "(1) the timeliness of the motion; (2) the adequacy of the court's inquiry into the defendant's motion; (3) whether the conflict was so great that it resulted in a total lack of communication preventing an adequate defense." *Bjorkman*, 270 F.3d at 500.

As the record reflects, Best had been trying for a long time to obtain new appointed counsel. After his conviction, he tried again on August 26, 2002, one month before his

sentencing hearing was originally scheduled but more than a year before it eventually took place. Vanes and Holesinger were in favor of the motion, and the government agreed that "good cause" existed to remove them because an "irreconcilable conflict exists between the attorneys and the defendant."

One reason the court gave for denying Best's motion for new counsel was that it was filed two months before Best's death penalty trial was supposed to begin and his attorneys had already submitted charges for over $100,000. Later, Best's murder charges were vacated and dismissed. Although the government points out that the dismissal of those charges made the timeliness factor relatively unimportant *ex post*, we must assume that the district court did not have 20-20 foresight. At the time the court was required to rule, it was reasonable for the court to disfavor a change in lawyers because it would disrupt the overall ongoing proceedings.

The court also made an adequate inquiry into the need for new counsel. At the hearing on August 30, 2002, the court heard what both Best and the two attorneys had to say about their relationship. It also had the benefit of its observations at the trial, which counsel had conducted after they lost their motion to withdraw. In denying Best's motion, the court concluded that "trial counsel did not allow the potential conflict of interest they were facing as a result of Defendant's accusations [regarding their ineffectiveness] to develop into an actual conflict."

Finally, we consider whether the conflict between Best and his attorneys "resulted in a total lack of communication preventing an adequate defense.*" Bjorkman,* 270 F.3d at 500. All parties agree that Best and his counsel had a contentious relationship during the course of his trial. The court was entitled to conclude, based on what occurred at the trial, that total breakdown had not occurred, and thus

that it was not necessary to replace Vanes and Holesinger for the sentencing phase. And indeed, the two lawyers handled the sentencing proceeding professionally. They objected to the drug quantities attributed to Best and to how the government made its calculations. They objected to finding that Best himself possessed a firearm in connection with drug trafficking when the weapons were found with so many other individuals in the home. On this record, we find that the court did not abuse its discretion in denying Best's motion for new counsel.

## IV

Finally, Best argues that his sentence violates the Sixth Amendment. The court sentenced Best to life imprisonment based on its conclusion that his offense level was a level 44 and a Criminal History Category V. The court found that over 1.5 kilograms of cocaine base were attributable to Best. The court also found that he possessed a dangerous weapon in connection with drug trafficking and the court applied a two-level enhancement under U.S.S.G. § 2D1.1(b)(1). The court finally concluded that he was an organizer or leader of five or more participants in the crime and imposed a four-level enhancement under § 3B1.1(a).

Best does not challenge these computations as erroneous under the Guidelines, and so we may take them as a proper starting point. Nonetheless, under *Booker* it is now established that the Guidelines are advisory only. Because the court sentenced Best under the assumption that the Guidelines were mandatory, we order a limited remand under the procedures outlined in *United States v. Paladino*, 401 F.3d 471, 483-84 (7th Cir. 2005), so that the district court may inform us whether it is inclined to impose the same sentence under the now-advisory Guidelines.

## V

We AFFIRM Best's conviction and order a LIMITED REMAND to the district court under *Paladino*.

A true Copy:

Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*

USCA-02-C-0072—10-24-05