In the

# United States Court of Appeals
## For the Seventh Circuit

_____

Nos. 23-1498 & 23-2171

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

PIERRE ROBINSON and DERRICK SWANSON,

*Defendants-Appellants.*

_____

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 18-cr-00758 — **John J. Tharp, Jr.**, *Judge.*

_____

ARGUED FEBRUARY 27, 2025 — DECIDED JULY 9, 2025

_____

Before ST. EVE, LEE, and MALDONADO, *Circuit Judges.*

ST. EVE, *Circuit Judge.* Pierre Robinson and Derrick Swanson were each charged with murdering an opposing gang member to advance their standing in Evans Mob, a street gang in Chicago's Chatham neighborhood. While Swanson entered a cooperation agreement with the government and pleaded guilty, Robinson chose to proceed to trial.

At Robinson's trial, the government called Robinson's cousin Anise to identify him as the man who shot and killed the victim, Glenn Houston, Jr. Anise had previously identified Robinson as the shooter in a recorded statement to Chicago police and before a grand jury. But she was unable to do so at trial, professing that a recent medical issue rendered her unable to recognize Robinson or remember her past identifications of him. In response, the government moved to admit both Anise's statement to police and her grand jury testimony as a declarant witness's prior inconsistent statements. The district court granted its motion. After a four-day trial, the jury convicted Robinson.

Robinson and Swanson both appeal. Robinson contends that the admission of Anise's testimonial hearsay statements violated his rights under the Confrontation Clause. He also argues that his trial counsel rendered ineffective assistance. Swanson challenges only his sentence, asserting that a condition of his supervised release conflicts with his sentence as orally pronounced. Finding no merit in Robinson or Swanson's challenges, we affirm.

## I. Background

Pierre Robinson and Derrick Swanson are members of Evans Mob, a street gang within the Chatham neighborhood of Chicago. Evans Mob plagued the 79th Street community with drugs and violence—selling narcotics, committing robberies, and murdering opposing gang members. Among the gang's many crimes are two murders at the heart of this case.

### A. The Murders of Glenn Houston, Jr. and Anthony Carter

Glenn Houston, Jr. was murdered on December 23, 2014, while shopping at a local grocery store. A surveillance camera

in the store captured the murder. The footage shows the shooter, his shirt pulled up over his face, entering the store. It tracks him as he strolls by the frozen section and briefly lowers his shirt. And it records him as he raises a revolver, shoots Houston, Jr., and flees the scene.

No one present at the time of the murder was able to identify Houston, Jr.'s shooter. But two weeks later, an unexpected informant came forward—Robinson's cousin, Anise. She had fallen out with Robinson several years prior and was a friend of Houston Jr.'s older sister. She was also a former cashier at the grocery store. In a recorded interview, Anise told Chicago police and a Cook County prosecutor that she had viewed the surveillance footage and recognized Robinson as the man who shot Houston, Jr. Anise repeated her identification before a grand jury in 2018 and testified that her recorded statement to police was true and correct. She also authenticated a DVD of the statement, which the government played for the grand jury. Anise's sisters, Ciara and Regina, similarly identified Robinson as the shooter before the grand jury.

Meanwhile, law enforcement investigated a second crime linked to Evans Mob: the murder of Anthony Carter outside a Chatham gas station. Quick detective work turned up witness testimony, surveillance footage, shell casings, and text messages showing that Derrick Swanson had shot and killed Carter in retaliation for Carter's threats against another member of Evans Mob.

In April of 2019, the grand jury returned a superseding indictment charging Robinson and Swanson each with one count of murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1). The indictment alleged that Evans Mob was a criminal enterprise and that Robinson and Swanson

had murdered to maintain or advance their standing in the gang. Facing a mandatory minimum sentence of life in prison, Swanson elected to enter a cooperation plea agreement with the government. Robinson proceeded to trial.

**B. Robinson's Trial**

As the government prepared for Robinson's August 2022 trial, it reached out to his cousin Anise to secure her testimony. But circumstances had changed for Anise in the intervening four years. She informed prosecutors that after the medically complicated birth of her daughter, she suffered from memory loss. She could not recognize Robinson nor remember her prior identifications of him as the shooter in the surveillance footage.

The government nevertheless subpoenaed Anise's testimony and filed a pre-trial motion requesting the court admit her grand jury statement and recorded police interview as prior inconsistent statements exempted from the rule against hearsay. Robinson objected, contending that Anise's memory loss would deprive him of the opportunity to cross-examine her on her identifications of him. The district court overruled the objection and admitted Anise's testimony. It held that her prior statements were exempt from the rule against hearsay under Federal Rule of Evidence 801(d)(1)(A) and were not barred by the Confrontation Clause because Robinson would have an adequate opportunity to cross-examine her.

When Anise took the stand, she testified that she suffered from partial memory loss and had no memories of Robinson prior to trial. She was nonetheless able to verify her signature on exhibits presented to the grand jury, including the DVD of her statement to Chicago police. With the requisite

foundation laid, the government introduced Anise's grand jury testimony adopting her statement to police. It then played the recorded police interview where Anise identified Robinson as the shooter for the jury.

On cross-examination, Robinson questioned Anise on whether she was biased against him, asking about her close friendship with Houston, Jr.'s sister, her keen interest in the surveillance footage, and her own gang affiliation. Anise confirmed the friendship but denied that she had ever been involved in a gang. Robinson also probed Anise's memory, verifying that she could not remember reviewing the surveillance footage, making a statement to Chicago police, or testifying before the grand jury. Robinson forwent any argument that Anise's memory loss was feigned, however.

The government's case did not begin and end with Anise. It also called Swanson and Ciara to the stand, who both identified Robinson as the shooter in the surveillance video.[1] Swanson further testified to the internal dynamics of Evans Mob and told the jury that Robinson had confessed to him that he had murdered Houston, Jr. The government also entered into evidence inculpatory social media posts from Robinson's and Swanson's accounts. In one post, published a mere forty minutes prior to Houston, Jr.'s murder, Robinson memorialized a fallen Evans Mob member and promised to retaliate in his honor. Another, posted about a year after the

---

[1] The government called Regina to testify, too, but she became upset when the government played the surveillance video, telling the jury "I can't watch this." Upon further questioning, she recanted her earlier identification of Robinson, testifying that she told the grand jury "what I thought they wanted me to say."

murder and captioned "#BackdownMemoryLane No Opps Just 🎯🎯🎯🚫", depicted Robinson promoting his membership in Evans Mob in front of the grocery store where Houston, Jr. was killed. Still a third video featured Robinson pointing a revolver at the camera and bragging that the government had "no face" and thus "no case" against him.

After two hours of deliberation, the jury returned a guilty verdict. The court sentenced Robinson to life in prison.

**C. Swanson's Sentencing**

Following Robinson's trial, the district court sentenced Swanson to a below-mandatory-minimum sentence of thirty years of imprisonment and five years of supervised release. The court then confirmed that Swanson had no objections to the probation department's proposed release conditions. His counsel replied:

> No Judge. I mean, one that I have considered bringing up and different judges have different views on it is the probation officer being able to come to my client's place of employment as a place to–

The court interjected, ruling "I will – on that what I'll interpret as an objection, I'll grant that objection and that will not be ordered." Robinson subsequently waived his right to have the court read and explain his release conditions.

In its written judgment of conviction, the court did not order Swanson to "permit a probation officer to visit [him] at any reasonable time … at work" ("Model Condition 16"). But it did impose a condition that requires Swanson to "submit [his] person, property, house, … or office, to a search conducted by a United States Probation Officer(s)" upon

reasonable suspicion that he has violated a term of his super-vised release ("Model Condition 23").

## II. Discussion

In this appeal, Robinson asserts that the admission of An-ise's testimony violated his rights under the Confrontation Clause. He also alleges that his trial counsel rendered ineffec-tive assistance by failing to vigorously dispute Anise's testi-mony. Swanson challenges a single term of his supervised re-lease, contending that it is inconsistent with his sentence as orally pronounced.

## A. Robinson's Confrontation Clause Claim

The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right … to be confronted with the witnesses against him." U.S. Const. amend. VI. At the heart of the confrontation right is cross-examination: "testing the recollection and sifting the conscience of the witness" as he stands face-to-face with the jury. *Mattox v. United States*, 156 U.S. 237, 242–43 (1895); *see also Kentucky v. Stincer*, 482 U.S. 730, 737 n.8 (1987) (describing "[o]ne noted commentator['s ]" view that the "main purpose of confrontation is to secure for the opponent the opportunity of cross examination" (internal quotation marks omitted)).

Robinson submits that admission of Anise's prior state-ments violated his rights under the Confrontation Clause be-cause her memory loss was both pervasive and genuine, so he lacked a "meaningful" opportunity to cross-examine her. We review his Confrontation Clause challenge de novo. *United States v. Norwood*, 982 F.3d 1032, 1042 (7th Cir. 2020).

The Confrontation Clause is generally satisfied when a criminal defendant enjoys "a full and fair opportunity to

probe and expose" infirmities in an adverse witness's testimony. *Delaware v. Fensterer*, 474 U.S. 15, 22 (1985) (per curiam); *see also Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004) (requiring testimonial hearsay declarants be "present at trial to defend or explain" their statements). So where a defendant has the opportunity to "impugn" a witness's beliefs during cross-examination—for example, by calling the jury's attention to defects in the witness's sincerity, memory, narration, or perception—the Clause will not bar admission of that witness's out-of-court statements. *United States v. Owens*, 484 U.S. 554, 559–60 (1988); *see also United States v. Keeter*, 130 F.3d 297, 302 (7th Cir. 1997) (finding the Confrontation Clause satisfied "when the witness must look the accused in the eye in court [and] shortcomings in the declarant's memory may be made known to the jury").

As the Supreme Court and we have repeatedly held, a witness's memory loss does not invariably deprive a defendant of his rights under the Confrontation Clause. *See, e.g., Owens*, 484 U.S. at 560; *United States v. Shaffers*, 22 F.4th 655, 660–61 (7th Cir. 2022); *Keeter*, 130 F.3d at 302. After all, the confrontation right does not guarantee "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Owens*, 484 U.S. at 559. And where a witness's testimony is "marred by forgetfulness, confusion, or evasion" a defendant may nevertheless have an adequate opportunity to probe the witness's explanations and attack her credibility before the jury. *Fensterer*, 474 U.S. at 22.

Here, despite Anise's significant (and ostensibly genuine) memory loss, Robinson had the opportunity to challenge her credibility before the jury—and he actually did so. On cross-examination, he impugned Anise's sincerity, eliciting

responses to impeachment questions about her gang affiliation, close relationship with Houston, Jr.'s sister, and unusual interest in the surveillance footage. Robinson also drew the jury's attention to Anise's memory problems, confirming that she could not remember reviewing the surveillance footage or identifying Robinson. And while Robinson did not challenge Anise's perception by questioning her about her eyesight and ability to identify him in a video he decried as "blurry" and "dark" in closing argument, he could have.

In short, Robinson had the opportunity to cross-examine Anise and wield "realistic weapons" to challenge her credibility. *See Owens*, 484 U.S. at 560. We therefore hold that admission of her testimonial hearsay statements did not violate the Confrontation Clause.

## B. Robinson's Ineffective Assistance of Counsel Claim

The Sixth Amendment guarantees a criminal defendant "the right … to have Assistance of Counsel for his defense." U.S. Const. amend. VI. Robinson asserts that his trial attorneys rendered constitutionally deficient assistance, *see Strickland v. Washington*, 466 U.S. 668 (1984), by failing to vigorously dispute Anise's testimony and out-of-court statements.

Before reaching the merits of Robinson's claim, we underscore the risk he assumes by raising it on direct appeal. We may adjudicate an ineffective-assistance claim only once; a defendant who pursues his claim on direct appeal may not reassert it on collateral review. *United States v. Onamuti*, 983 F.3d 892, 895 (7th Cir. 2020). And as we have repeatedly warned, collateral review is almost invariably a better forum for ineffective-assistance claims. *See United States v. Cates*, 950 F.3d 453, 456–57 (7th Cir. 2020) (collecting cases).

To prevail on an ineffective-assistance-of-counsel claim, a defendant must demonstrate that his counsel's conduct fell "below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688.[2] Yet the reasonableness of an attorney's conduct generally turns on what she knew, what she should have known, and why she acted as she did—facts unlikely to be found within the record on direct appeal. *See United States v. Hise*, 65 F.4th 905, 909 (7th Cir. 2023).

Adding to a defendant's burden, *Strickland*'s presumption of attorney competence applies with greatest force on direct review. "When the only record on which a claim of ineffective assistance is based is the trial record," we must give "every indulgence … to the possibility that a seeming lapse or error by defense counsel was in fact a tactical move, flawed only in hindsight." *United States v. Taglia*, 922 F.2d 413, 417–18 (7th Cir. 1991).

Still a third legal rule may stymie ineffective-assistance claims on direct appeal: our standard of review. Like Robinson, most defendants do not raise their ineffective-assistance claims in the district court prior to appealing their convictions. As a result, we generally review these claims for plain error. *See Cates*, 950 F.3d at 456; Fed. R. Crim. P. 52(b). Under plain error review, we reverse only if counsel's ineffectiveness was "plain" or "obvious," and not only prejudiced the defendant but also "seriously affected the fairness, integrity or public reputation of judicial proceedings." *United States v. Olano*, 507 U.S. 725, 734, 736 (1993) (citation modified).

---

[2] *Strickland* also requires the defendant demonstrate that his counsel's deficient performance prejudiced him. *Id.* at 687.

In his briefing, Robinson acknowledged the risks of raising his ineffective-assistance claim on direct appeal. We nevertheless asked Robinson's counsel at oral argument whether he had discussed these risks with his client. Counsel confirmed that he had and that Robinson wished to proceed. We therefore reach the merits of his claim.[3]

Robinson points to three omissions by his trial counsel to support his claim of ineffective assistance: the failure to (1) ask Anise how she recognized her signatures on the exhibits

---

[3] Our sister circuits generally refuse to entertain ineffective-assistance claims on direct appeal. *See United States v. Flete-Garcia*, 925 F.3d 17, 39–40 (1st Cir. 2019) (dismissing without prejudice an ineffective-assistance claim that depended on further factual development); *United States v. Benton*, 523 F.3d 424, 435 (4th Cir. 2008) (same); *United States v. Green*, 47 F.4th 279, 296 (5th Cir. 2022) (same); *United States v. Buchanan*, 933 F.3d 501, 513 (6th Cir. 2019) (same); *United States v. Oliver*, 950 F.3d 556, 566–67 (8th Cir. 2020) (same); *United States v. McGowan*, 668 F.3d 601, 605–06 (9th Cir. 2012) (same); *see also United States v. Knight*, 824 F.3d 1105, 1112–13 (D.C. Cir. 2016) (remanding for an evidentiary hearing when a defendant raises a "colorable" ineffective-assistance claim on direct appeal).

Our historical practice, too, was to decline to reach unripe ineffective-assistance claims on direct appeal. *See United States v. Best*, 426 F.3d 937, 944 (7th Cir. 2005) ("Normally, we do not review ineffective assistance of counsel claims on direct review…"); *see also United States v. Brooks*, 125 F.3d 484, 495 (7th Cir. 1997); *United States v. Marshall*, 985 F.2d 901, 906 (7th Cir. 1993). While neither party advocates that we revert to our prior practice—and we do not do so here—we pause to observe its advantages, including greater judicial efficiency and procedural protections for defendants. *See, e.g.*, *Massaro v. United States*, 538 U.S. 500, 505 (2003) (remarking that "rules of procedure should be designed to induce litigants to present their contentions to the right tribunal at the right time" and trial courts are "best suited to developing the facts necessary to determining the adequacy of representation" (citation modified)).

presented to the grand jury, (2) emphasize Anise's memory loss in closing arguments, and (3) request a jury instruction on the effect of Anise's memory loss.

None of the above satisfy Robinson's weighty burden to show that it was "obvious" that his trial counsel's performance fell below an objective standard of reasonableness and seriously affected the fairness of the judicial proceedings. Robinson's trial counsel may have refrained from inquiring into Anise's signatures out of concern that her response would bolster her credibility, rather than undermine it. Similarly, trial counsel could have reasonably concluded that the jury was sympathetic to the difficult birth of Anise's daughter, and argument focused on her bias, rather than her memory, would be more persuasive. As for trial counsel's failure to request a special jury instruction, Robinson has not come forward with any precedent supporting his entitlement to such an instruction. So we disagree that his counsel's failure to request one plainly fell below an objective standard of reasonable professional conduct. We therefore hold that Robinson has not demonstrated that his trial counsel rendered constitutionally inadequate assistance.

### C. Swanson's Sentencing Claim

Swanson challenges only a small portion of his sentence—the ability of probation officers, upon reasonable suspicion, to search his workplace while he is on supervised release (Model Condition 23). He charges that this condition, included in his written judgment of conviction, is inconsistent with his sentence as orally pronounced. We review claims of discrepancy between oral and written judgments de novo. *United States v. Dennis*, 119 F.4th 1103, 1113 (7th Cir. 2024).

When a defendant's written judgment of conviction conflicts with the court's unambiguous oral pronouncement of his sentence, the oral pronouncement controls. *United States v. Malinowski*, 129 F.4th 431, 436 (7th Cir. 2025). Yet not every difference between a written judgment and an oral pronouncement constitutes a conflict. *United States v. Strobel*, 987 F.3d 743, 748 (7th Cir. 2021). A written judgment of conviction may "clarify" an ambiguous oral pronouncement, so long as it does not contradict it. *Id.*

We are skeptical that Swanson's "place of employment" objection or the court's grant of this objection referred to anything more than unannounced visits at his workplace at any reasonable time (Model Condition 16). But even assuming the court's oral pronouncement was ambiguous, Swanson's challenge fails. The district court never expressly stated that it would modify Model Condition 23, which requires visiting officers have reasonable suspicion, and Swanson waived his right to an in-court reading of his release conditions. *See id.* (explaining that where a defendant waives in-court recitation of his supervised release conditions, a sentencing court may incorporate previously reviewed conditions by reference). The written judgment thus does not contradict his sentence as orally pronounced. At best, it may be read to clarify the sweep of the granted objection, an elucidation our law permits.

*       *       *

The judgments of the district court are

AFFIRMED.