RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 19a0173p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

KITROY BRIAN BUCHANAN,

*Defendant-Appellant*.

┐
│
│
│
├  No. 18-3667
│
│
│
┘

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:18-cr-00008-1—James S. Gwin, District Judge.

Argued:  June 25, 2019

Decided and Filed:  July 31, 2019

Before:  SUTTON, BUSH, and LARSEN, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:**  David Graham, UNIVERSITY OF MICHIGAN LAW SCHOOL, Ann Arbor, Michigan, for Appellant.  Matthew B. Kall, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.  **ON BRIEF:**  David Graham, Melissa M. Salinas, UNIVERSITY OF MICHIGAN LAW SCHOOL, Ann Arbor, Michigan, for Appellant. Matthew B. Kall, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.

─────────────

## OPINION

─────────────

JOHN K. BUSH, Circuit Judge.  After a jury trial, Kitroy Brian Buchanan was convicted of one count of possession with intent to distribute marijuana and one count of conspiracy to

distribute marijuana.  The district court sentenced him to 50 months' imprisonment followed by three years of supervised release.  Buchanan now appeals his conviction and sentence, and he makes four arguments.  We find merit in one of his arguments—a challenge to a two-level increase in his offense level for committing a crime "as part of a pattern of criminal conduct engaged in as a livelihood" under USSG §§ 2D1.1(b)(16)(E) and 4B1.3.  Therefore, we **AFFIRM** the district court's judgment of conviction but **VACATE** Buchanan's sentence and **REMAND** for the district court to reconsider, under the proper legal standard, whether the enhancement applies.

## I.  BACKGROUND

A.     Factual Background

In 2015, Buchanan, who was already involved in the marijuana trade, met a United States postal worker named Dominique Hobbs in South Euclid, Ohio.  Buchanan asked Hobbs if he would like to "do some business," which Hobbs understood to mean that Buchanan wanted Hobbs to help him deliver illegal drugs.  R. 73, PageID 544.  Hobbs said he was interested, and the two men exchanged phone numbers.  However, Hobbs was not able to help Buchanan immediately; he explained to Buchanan that he did not have a consistent postal route but was a "U-person," or utility carrier, who substituted for those with regular routes when they had to miss work.  *Id.* at PageID 547–48.

In November 2017, Hobbs let Buchanan know that he had obtained a regular postal route, and the two began working together.  Buchanan promised to pay Hobbs $200 in exchange for each package Hobbs would deliver.  Hobbs also supplied Buchanan with lists of addresses on Hobbs's postal route so Buchanan would know where Hobbs, in conjunction with his mail deliveries, could deliver packages of marijuana.

One day late in November 2017, Buchanan informed Hobbs that a package of marijuana was due to arrive in South Euclid soon, but Buchanan was not sure of the exact arrival date.  Hobbs told Buchanan that he would not be able to deliver the package if it happened to arrive in town that coming Monday, because Hobbs was not working that day.  As it turned out, however, the package arrived at the South Euclid post office that Monday.  Buchanan had been tracking

the package through the United States Postal Service's website and alerted Hobbs. Although Hobbs reminded Buchanan that he was off duty, he agreed to help Buchanan try to lay hands on the package.

Buchanan and Hobbs both drove to the post office. Hobbs asked his supervisor, who was covering Hobbs's route that day, whether he had Buchanan's package; the supervisor had not seen it. Hobbs told Buchanan.

Buchanan became enraged and began shouting at Hobbs, accusing him of stealing the package, which Hobbs denied. After Hobbs and Buchanan unsuccessfully made another attempt to find the package at the post office, Buchanan cornered Hobbs, searched his car for the package, and then ordered him to chauffeur Buchanan around other postal carriers' routes to ask the other carriers if they had the package. While he and Hobbs were in the car, Buchanan made "[a]t least ten" phone calls to someone whom he told that Hobbs "had the package" and was "hiding it from" Buchanan. *Id.* at PageID 585, 589.

After a long and fruitless search along other carriers' postal routes, Hobbs and Buchanan had not located the package. Buchanan let Hobbs go home, but he continued to call and send text messages to Hobbs, reiterating that he believed Hobbs had stolen the package and suggesting that for Hobbs's own safety, he had better return the package to Buchanan.

Fearing for his safety, Hobbs went to the police and made a complaint of kidnapping against Buchanan, telling the police select details of his interactions with Buchanan without admitting that he had been complicit in any drug activity. Because Hobbs was a postal worker, the police communicated Hobbs's accusation to the Postal Inspection Service, a law-enforcement arm of the United States Postal Service. Hobbs reiterated his story to the postal inspectors. Having learned from Hobbs some details about the kind of car Buchanan drove, law-enforcement officers then used database information to identify suspect vehicles; this investigation eventually led them to Buchanan's car and home. On December 8, 2017, officers conducted a drug sniff of Buchanan's car, and the dog alerted to the smell of narcotics from the car.

Buchanan was arrested on a charge of kidnapping. Law-enforcement officers also obtained and executed search warrants for Buchanan's home, his car, and his cellphone. The search of Buchanan's home revealed over 150 grams of marijuana, a vacuum sealer, and plastic food-storage bags, among other evidence of marijuana trafficking. The search of the cellphone revealed that Buchanan was tracking another package. Following the tracking information from Buchanan's cellphone, postal inspectors determined that the package was headed to an address on Hobbs's route; the inspectors intercepted the package, obtained a search warrant, and opened the package to find 4.8 kilograms of marijuana. In addition, the inspectors determined that the return address on the package—which purported to have come from California—was fake.

Because Hobbs's complaint had led to Buchanan's arrest, law-enforcement officers questioned Hobbs further and learned that Hobbs had concocted a false kidnapping complaint to get Buchanan off his back without at the same time implicating himself in a marijuana-distribution scheme. After admitting that he had made up the kidnapping story, Hobbs also admitted to his agreement and cooperation with Buchanan. Hobbs eventually pled guilty to charges of lying to law enforcement and tampering with evidence, and he agreed to testify against Buchanan.

B.      The Trial

On January 4, 2018, Buchanan was indicted for one count of conspiracy to distribute a controlled substance, one count of possession of a controlled substance with intent to distribute, and three counts of communicating threats in interstate commerce. Because Hobbs had admitted that Buchanan did not really kidnap him, the government dropped the kidnapping charge.

At trial, Hobbs testified about his association with Buchanan, leading up to the day that the package went missing. Among other evidence, the government also presented testimony by two postal inspectors, Michael Adams and Lauren Cajuste. Adams had participated in the search of Buchanan's home, and Cajuste had investigated the information found on Buchanan's cellphone.

Adams testified that he had extensive experience and training in narcotics investigations and had served eight years as a narcotics agent before becoming a postal inspector. He testified that, based on his experience, the amount of marijuana found in Buchanan's home was a "dealer/supplier amount" and that some of the food-packaging supplies found there were of the sort commonly used by drug traffickers. Adams also testified that drug traffickers often use fake return addresses when sending packages through the mail and that they often use express or priority mail to reduce the risk that law enforcement will seize and search packages. Hobbs had testified, and the government's exhibits at trial showed, that Buchanan had used priority mail to ship packages. Adams also testified that some of the messages Buchanan had sent to alleged co-conspirators contained drug-traffickers' jargon. Among other testimony, Adams also testified that ten pounds of marijuana—an amount comparable to that found in the intercepted package—was worth roughly $30,000 to $50,000 on the "street" in Cleveland. *Id.* at PageID 482.

Cajuste stated that she had worked on financial investigations for the first six years of her time as a postal inspector before broadening her focus to include workplace violence as well as financial investigations. She then testified at length about what the analysis of Buchanan's cellphone and financial records had revealed. Buchanan had communicated extensively with someone in California about the delivery of packages, and he had sent the delivery addresses he received from Hobbs to the California phone number. Buchanan's contact in California would send Buchanan tracking information for each package, and Buchanan would track each package on the Postal Service's website until it was delivered. According to Buchanan's financial records, Buchanan sent payments to accounts given to him by the California contact. In addition to Cajuste's testimony on these matters, the government presented numerous exhibits showing Buchanan's phone and tracking activity.

Testimony and exhibits also established that, besides the California contact, Buchanan regularly communicated with an individual located in or near Erie, Pennsylvania about delivering packages. Buchanan's text messages with the Erie contact demonstrated that Buchanan and the contact appeared to take turns driving to meet each other, and one would text the other when he was twenty minutes away from the meeting place. Buchanan's financial records showed that he frequently deposited money into his bank account after Erie trips.

In addition to testifying about what she had learned through the investigation of Buchanan's cellphone and financial records, Cajuste testified about the implications of these findings based on her experience as a postal inspector. Specifically, Cajuste testified (on cross-examination) that one of the individuals with whom Buchanan had communicated about drug deliveries had used a "burner phone" that was not registered with any phone company. R. 74, PageID 700. She continued, "You buy a burner phone, typically in most drug conspiracies most individuals use burner phones so they can avoid detection." *Id.* at PageID 700–701. Cajuste also testified that Buchanan had sent and received messages via an application called WhatsApp, and she stated that "WhatsApp is a messaging system that is generally used because it has a heavy encryption system." R. 73, PageID 663.

Buchanan did not call any witnesses and did not testify. Once the government's case had concluded, the court went over the proposed jury instructions with the parties. Both parties had submitted proposed instructions on "expert" or "opinion" testimony. In addition, the government had submitted a proposed instruction to address witnesses who gave mixed fact and opinion testimony, as Adams and Cajuste had done. However, when the prosecutor raised these instructions to the district court, the district court responded, "I don't know that we had any opinion testimony." R. 74, PageID 735. The prosecutor began to explain that he viewed Adams as having given both fact testimony based on his role in investigating Buchanan and opinion testimony based on his experience and training in narcotics investigations. The district court reiterated, "Unless there's some need, I didn't think that would qualify as opinion testimony." *Id.* Defense counsel agreed, "No, Your Honor." *Id.* When it charged the jury, the district court did not give any instruction on opinion testimony or mixed fact and opinion testimony.

The jury convicted Buchanan of possession of marijuana with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), and conspiracy to distribute marijuana, in violation of 21 U.S.C. § 846. He was acquitted of the threat counts.

C.      The Sentencing

Before sentencing, Buchanan and the government stipulated that Buchanan was responsible for 79.2 kilograms of marijuana. Using this figure to obtain a base offense level of

20 and adding four two-level enhancements, Buchanan's presentence report ("PSR") calculated his total offense level as 28. At the sentencing hearing, the district court decided to apply only three of the enhancements and sentenced Buchanan based on a total offense level of 26. Relevant to this appeal, Buchanan's counsel objected to a two-level enhancement under USSG § 2D1.1(b)(16)(E)[1] for "committ[ing] the offense as part of a pattern of criminal conduct engaged in as a livelihood." After hearing argument from both sides, the district court overruled the objection and applied the enhancement.

Considering Buchanan's criminal history category of I together with Buchanan's total offense level of 26, the district court calculated a Guidelines range of 63 to 78 months. The district court then considered the 18 U.S.C. § 3553(a) factors and decided to vary downward and impose a sentence of 50 months on each count. Finally, the district court decided to run the sentences concurrently and to impose a three-year term of supervised release following the prison term. Thus, Buchanan received a sentence of 50 months of imprisonment followed by three years of supervised release.

D.     The Appeal

The district court entered judgment against Buchanan on July 9, 2018, and Buchanan timely appealed to this court. On appeal, Buchanan makes one challenge to his conviction and three challenges to his sentencing. First, he asks this court to vacate his conviction and sentence and remand for a new trial because, he argues, the district court erred in failing to instruct the jury properly on how to weigh the mixed fact and opinion testimony of Adams and Cajuste, and this failure prejudiced him.

Second, Buchanan argues that the district court erred in sentencing him without considering the statutory maximum sentence of 60 months on each of the counts of which he was convicted. Defense counsel did not raise this issue to the district court. Therefore, Buchanan's third argument is that he received ineffective assistance of counsel when defense counsel did not object to the district court's alleged failure to consider the statutory maximum sentence.

---

[1]The sentencing documents and the parties' briefs refer to § 2D1.1(b)(15)(E). After Buchanan was sentenced, however, the Guidelines were amended, and the relevant enhancement now appears in § 2D1.1(b)(16)(E).

Finally, Buchanan argues that the district court erred in imposing the two-level enhancement for engaging in criminal conduct as a livelihood.  He asks this court to remand for resentencing on the basis of these asserted errors.

We will address each of Buchanan's arguments in turn.

## II.  DISCUSSION

A.    Instruction on Opinion Testimony

Because defense counsel did not object to the district court's lack of an instruction on mixed fact and opinion testimony, this court would ordinarily review for plain error.  *See Johnson v. United States*, 520 U.S. 461, 466–67 (1997).  Under that standard, this court may reverse for "(1) error, (2) that is plain, and (3) that affect[s] substantial rights" if "(4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings."  *United States v. Acosta*, 924 F.3d 288, 299 (6th Cir. 2019) (alterations in original) (citations omitted).  However, the government argues that this issue is not reviewable at all because Buchanan waived it by expressly agreeing with the district court that no instruction was needed.  *See United States v. Sloman*, 909 F.2d 176, 182 (6th Cir. 1990) ("An attorney cannot agree in open court with a judge's proposed course of conduct and then charge the court with error in following that course."); *see also United States v. Olano*, 507 U.S. 725, 733 (1993) ("Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right." (citations and internal quotation marks omitted)).

Buchanan responds that even if he invited the district court's error, this court should overlook the waiver "because the interests of justice demand it."  Reply Br. at 14 (citing *United States v. Savoires*, 430 F.3d 376, 381 (6th Cir. 2005); *United States v. Barrow*, 118 F.3d 482, 491 (6th Cir. 1997)).  Furthermore, Buchanan argues, he was no more at fault for inviting the error than was the government: both parties initially submitted proposed instructions on opinion testimony, but both parties later agreed with the district court that no such instruction was necessary.

Although both the government and Buchanan have some case law on their sides, we need not declare a winner on the standard-of-review point: Buchanan's claim fails even on plain-error review.

Both parties agree that the district court should have given an instruction on how to weigh mixed fact and opinion testimony. As we recognized in *United States v. Lopez-Medina*, 461 F.3d 724, 745 (6th Cir. 2006), when law-enforcement officers testify both as to the facts of a case and as to their interpretation of those facts based on their experience, the district court must give a cautionary instruction. The instruction generally should inform the jury about the difference between fact and opinion testimony and let the jury know that it does not have to accept opinion testimony. *See id.* at 743–44. In addition, the instruction should tell the jury to consider the witnesses' qualifications and experience in deciding whether their testimony is credible. *See id.* In *Lopez-Medina*, as here, there was no "clear demarcation between [the] fact testimony and expert opinion testimony" given by certain government witnesses, and this court found "that the district court committed an error that was plain or obvious" in allowing the testimony of those witnesses without a cautionary instruction. *Id.* at 745. *Lopez-Medina*'s applicability to this case is clear, and thus the first two elements of plain error have been met.

However, the parties disagree over whether the district court's failure to give the instruction here affected Buchanan's substantial rights. "In the context of challenges to jury instructions, plain error requires a finding that, taken as a whole, the jury instructions were so clearly erroneous as to likely produce a grave miscarriage of justice." *United States v. Semrau*, 693 F.3d 510, 528 (6th Cir. 2012) (citation omitted). Such a finding is proper "'if the instructions, viewed as a whole, were confusing, misleading, or prejudicial,' and 'the error seriously affected the fairness, integrity, or public reputation of the judicial proceedings.'" *Id.* (citations omitted).

Buchanan does not appear to argue that the jury instructions given by the district court were confusing or misleading, but he does argue that he was prejudiced by the missed instruction. According to Buchanan, he was prejudiced because Adams's testimony that items found in Buchanan's home were indicative of drug trafficking "essentially amounted to an expert opinion that the items . . . demonstrated a conspiracy to distribute" marijuana. Appellant Br. at

26 (quoting *Lopez-Medina*, 461 F.3d at 745). And Buchanan argues that both Adams's and Cajuste's testimony was "critical to demonstrating . . . the requisite intent to distribute marijuana." Appellant Br. at 28.

The government makes three arguments in response. First, it points out that the *Lopez-Medina* court reversed for plain error not solely on the basis of the missed instructions but, instead, on the cumulative basis of that error plus several additional errors at the defendant's trial. *See* 461 F.3d at 745 ("We discuss the issue of prejudice as it pertains to *all* of the evidentiary issues raised . . . ." (emphasis added)). Therefore, the government argues that the missed instructions alone do not entitle Buchanan to a new trial. Second, the government contends that all of the opinion testimony tended to show Buchanan's involvement in marijuana *trafficking*, which he conceded at trial, and did not support the conspiracy count in particular, which Buchanan contested. Finally, the government argues that other evidence so thoroughly incriminated Buchanan that Adams's and Cajuste's testimony—even if improperly considered as authoritative by the jury—did not affect the verdict.

Although the government is correct that this court reversed in *Lopez-Medina* on the basis of more than just the missed instructions, we could still reverse in this case if the failure to give the instructions was prejudicial and "seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *See Semrau*, 693 F.3d at 528. However, as discussed below, we agree with the government that the error was not prejudicial because Buchanan conceded most of the issues that Adams's and Cajuste's testimony supported. Furthermore, even to the extent that Adams's and Cajuste's testimony supported the conspiracy conviction as opposed to only the conviction for possession with intent to distribute, the government presented sufficient additional evidence supporting the conspiracy conviction that the opinion testimony was cumulative and unlikely to have influenced the verdict.

The elements of a drug distribution conspiracy are "(1) an agreement to violate drug laws . . . ; (2) knowledge and intent to join the conspiracy; and (3) participation in the conspiracy." *United States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005) (citation omitted). On the other hand, the elements of possession with intent to distribute are "(1) knowingly or

intentionally, (2) possessing, (3) with the intent to distribute, (4) a controlled substance." *United States v. Monger*, 185 F.3d 574, 576 n.2 (6th Cir. 1999).

Defense counsel apparently made a strategic choice not to contest whether Buchanan possessed marijuana with the intent to distribute it, or even whether Buchanan was involved in actually trafficking marijuana. In his opening statement, defense counsel announced that "one thing that [the prosecutor] and I will agree on, and we may not agree about much in this case, is that Kitroy Buchanan was a marijuana trafficker. He had marijuana in his apartment for sale. He received packages of marijuana from California for sale." R. 73, PageID 436. Defense counsel then explained that he intended to contest whether Buchanan was involved in a conspiracy and whether he had communicated threats in interstate commerce. Then, during closing argument, defense counsel repeated: "[Buchanan] possessed the marijuana, I'm not denying that. He was going to sell the marijuana, I'm not denying that, but the rest of this case the government failed to prove beyond a reasonable doubt." R. 74, PageID 763.

It is difficult to see which parts of Adams's testimony tended to prove more than Buchanan admitted. Much of the testimony that Buchanan now argues was prejudicial supported the propositions that Buchanan possessed commercial quantities of marijuana, intended to sell it, or shipped and received packages of marijuana to and from various buyers and sellers. For example, Adams testified that the food-packaging materials found in Buchanan's home were of a type commonly used by drug traffickers. But Buchanan admitted that he was a drug trafficker and had intended to sell the marijuana found in his house. As another example, Adams testified that drug traffickers like to use priority or express mail, and the government presented evidence that Buchanan used priority mail. Again, however, Buchanan admitted that he both received shipments of marijuana and intended to sell that which he had in his home.

Furthermore, Adams's testimony was cumulative. Hobbs's testimony and the government's exhibits amply corroborated it. For example, Hobbs testified that during the time he was in the car with Buchanan driving around and searching for the missing package, Buchanan repeatedly spoke with someone on the phone about the package. That testimony supported the theory that Buchanan was conspiring with at least one person to distribute marijuana. Hobbs also testified that he sent Buchanan lists of addresses to which Buchanan then

had packages delivered.   This testimony supported the same factual findings that Adams's testimony supported: Buchanan bought and sold marijuana and had it shipped through the mail.

Similarly, most of Cajuste's testimony simply duplicated what other evidence showed. True, Cajuste did give some opinion testimony that was not cumulative: she testified that WhatsApp and burner phones are used to avoid detection, and she did so in terms that suggested Buchanan was involved in a drug conspiracy.  However, this testimony added little to the dozens of exhibits presented by the government showing messages and phone calls between Buchanan and individuals in California and Pennsylvania; financial records demonstrating payments corresponding with some of those communications; and Hobbs's testimony about hearing Buchanan discussing the missing package on the phone, among other evidence.  Had Cajuste not testified about her experience with the use of WhatsApp and burner phones, it is very unlikely the jury would have reached a different conclusion about whether Buchanan conspired with others to distribute marijuana.

In sum, Buchanan has not demonstrated that the lack of a jury instruction on mixed fact and opinion testimony affected his substantial rights.  Therefore, Buchanan cannot meet his burden on plain-error review, and we affirm Buchanan's conviction of the two drug counts.

B.      The District Court's Alleged Failure to Consider the Statutory Maximum Sentence

Next, Buchanan argues that the district court sentenced him based on the wrong Guidelines range because it did not take into account the statutory maximum sentence of 60 months on each of his counts of conviction.  *See* 21 U.S.C. § 841(b)(1)(D).  Buchanan did not raise this argument to the district court, so we review for plain error.  *See United States v. Rosenbaum*, 585 F.3d 259, 266–67 (6th Cir. 2009).

As discussed above, the district court found that Buchanan's total offense level and criminal history category produced an advisory Guidelines range of 63 to 78 months of imprisonment.  The district court then sentenced Buchanan while assuming that this Guidelines range applied.  But Buchanan argues that the statutory maximum sentence of 60 months should have replaced the 63-to-78-month range as his Guidelines range under USSG § 5G1.1(a). Section 5G1.1(a) provides: "Where the statutorily authorized maximum sentence is less than the

minimum of the applicable guideline range, the statutorily authorized maximum sentence shall be the guideline sentence."

However, § 5G1.1(a) applies only to single-count convictions. For convictions on multiple counts, the Guidelines range is not replaced by the statutory maximum on any count. Instead, § 5G1.2(b) provides that the district court "shall determine the total punishment and shall impose that total punishment on each . . . count, except to the extent otherwise required by law." Next, § 5G1.2(c) provides that "[i]f the sentence imposed on the count carrying the highest statutory maximum is adequate to achieve the total punishment, then the sentences on all counts shall run concurrently, except to the extent otherwise required by law." Here, the district court calculated Buchanan's Guidelines range, considered the § 3553(a) factors, and departed downward to impose a total punishment of 50 months of imprisonment. The district court then imposed a sentence of 50 months on each count. Each count of conviction had the *same* statutory maximum, so either of the two 50-month sentences qualified as the sentence imposed on the count with the "highest" statutory maximum under § 5G1.2(c). Thus, the sentence imposed on the count with the highest statutory maximum was adequate to achieve the total punishment of 50 months. The district court correctly decided to run the two 50-month sentences concurrently. *See* USSG § 5G1.2(c).

Buchanan cites *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1345 (2016) for the proposition that on plain-error review, "[w]hen a defendant is sentenced under an incorrect Guidelines range—whether or not the defendant's ultimate sentence falls within the correct range—the error itself can, and most often will, be sufficient to show a reasonable probability of a different outcome absent the error." However, because Buchanan has not demonstrated that the district court calculated his Guidelines range incorrectly in light of the statutory maximum, he has not shown that the district court erred at all. Therefore, we need not address Buchanan's argument based on *Molina-Martinez*, which presupposes error and addresses only how a defendant can show that the error was plain.

One final argument deserves attention. In his reply brief, Buchanan acknowledges that "the government correctly asserts that the district court could have sentenced [him] to consecutive terms if it made findings in support of that sentence." Reply Br. at 10. With that

statement, Buchanan appears to admit that the district court was not bound to treat the statutory maximum as his Guidelines sentence. Nevertheless, Buchanan argues, the district court still should have considered the statutory maximum because "awareness of the statutory limits would have assisted the court in rendering a just sentence." *Id.* at 11. In other words, Buchanan argues that because the statutory maximum sentence has an "anchoring effect" on the district court's sentencing decisions, the district court's failure to consider the statutory maximum may have resulted in a higher sentence for Buchanan. *Id.* (quoting *United States v. Currie*, 739 F.3d 960, 966 (7th Cir. 2014)).

It is not clear whether Buchanan intends to abandon his *Molina-Martinez* argument—in other words, that his sentence was based on an incorrect Guidelines range—and rely solely on the "anchoring effect" argument. Regardless, his "anchoring effect" argument lacks merit. The sentence from the Seventh Circuit case Buchanan cites reads in full: "Statutory minima and maxima have an obvious anchoring effect on the judge's determination of a reasonable sentence in the sense that they demarcate the range within which the judge may impose a sentence." *Currie*, 739 F.3d at 966. In *Currie*, the district court mistakenly identified the statutory minimum as ten years when, in fact, it was five years. *Id.* at 964. Here, by contrast, there is no evidence that the district court mistook the relevant statutory maximum. Buchanan's PSR accurately listed the statutory maximum sentence on each of his counts of conviction as five years. *Cf. id.* ("[I]n sentencing [Currie] to a 121-month term, [the district court] remarked that it was bound by the ten-year minimum . . . ."). And as explained above, the district court's sentencing decision comported both with the relevant statutory maximum and with USSG § 5G1.2. Because the district court did not rely on an incorrect statutory maximum or minimum sentence, Buchanan's sentence was not erroneously "anchored" in the sense *Currie* addresses.

Most importantly, Buchanan's argument focuses on prejudice: he claims his substantial rights were affected because the district court was not aware of a factor—the statutory maximum—that might have led it to sentence him to a shorter term of imprisonment. To pass the plain-error barrier, however, Buchanan must first show an error at sentencing. And without his argument that the statutory maximum should have become his Guidelines sentence,

Buchanan makes no argument that the district court erred in calculating his Guidelines range. Therefore, he fails to show plain error.

C.      Ineffective Assistance of Counsel

Buchanan next claims that he received ineffective assistance of counsel when defense counsel failed to raise the statutory maximum in the district court. Ordinarily, we do not review on direct appeal ineffective-assistance claims that were not raised in the district court. *See United States v. Hughes*, 733 F. App'x 299, 299 (6th Cir. 2018). Although we may review such a claim if it "depend[s] entirely upon facts within the record or . . . present[s] purely legal questions," *United States v. Angel*, 355 F.3d 462, 469 (6th Cir. 2004) (citation omitted), that exception is a narrow one; as a general rule, ineffective-assistance claims "are best brought by a defendant in a post-conviction proceeding under 28 U.S.C. § 2255 so that the parties can develop an adequate record on the issue," *United States v. Aguwa*, 123 F.3d 418, 423 (6th Cir. 1997) (citation omitted). Here, we will follow the general rule and decline to review Buchanan's ineffective-assistance claim.

D.      Enhancement for a Pattern of Criminal Conduct Engaged in as a Livelihood

Finally, we come to the issue that requires a remand for resentencing. Buchanan argues, and we agree, that the district court erred in adding a two-level enhancement to his total offense level under USSG § 2D1.1(b)(16)(E) for "committ[ing] the offense as part of a pattern of criminal conduct engaged in as a livelihood."

Because Buchanan objected at sentencing to the livelihood enhancement, we review the district court's decision to apply the enhancement for an abuse of discretion. *See Gall v. United States*, 552 U.S. 38, 51 (2007) (stating that "significant procedural error[s]" amounting to an abuse of discretion include "failing to calculate (or improperly calculating) the Guidelines range"). In assessing the procedural reasonableness of the district court's sentencing decisions, we review legal conclusions de novo and factual findings for clear error. *United States v. Cole*, 359 F.3d 420, 425 (6th Cir. 2004).

Applying de novo review to the district court's legal conclusions, as we must, we conclude that the district court misinterpreted the Guidelines when it applied the livelihood enhancement to Buchanan. Therefore, the district court abused its discretion by calculating Buchanan's Guidelines range under the wrong legal standard, and Buchanan is entitled to resentencing because the error was not harmless.

Buchanan does not dispute that his activities constituted "a pattern of criminal conduct." He does dispute that this conduct was "engaged in as a livelihood." To define "engaged in as a livelihood," § 2D1.1 cross-references § 4B1.3. *See* USSG § 2D1.1, comment. (n.20(C)). In turn, the relevant application note to § 4B1.3 states that the district court must make two findings to determine that the defendant's criminal conduct was engaged in as a livelihood. *See id.* § 4B1.3, comment. (n.2).[2] First, the district court must find that "the defendant derived income from the pattern of criminal conduct that in any twelve-month period exceeded 2,000 times the then existing hourly minimum wage under federal law." *Id.* Second, the district court must find that "the totality of circumstances shows that such criminal conduct was the defendant's primary occupation in that twelve-month period (*e.g.*, the defendant engaged in criminal conduct rather than regular, legitimate employment; or the defendant's legitimate employment was merely a front for the defendant's criminal conduct)." *Id.*

However, the district court sentenced Buchanan based on the understanding that § 4B1.3 required only one finding: that Buchanan's criminal earnings exceeded 2,000 times the minimum wage in a twelve-month period. At sentencing, events transpired as follows.

---

[2]In *Stinson v. United States*, 508 U.S. 36, 42–43 (1993), the Supreme Court held that "[c]ommentary which functions to interpret a guideline or explain how it is to be applied . . . controls, and if failure to follow, or a misreading of, such commentary results in a sentence selected from the wrong guideline range . . . , that sentence would constitute an incorrect application of the sentencing guidelines." (cleaned up). Therefore, federal courts are to treat commentary to a particular Guidelines provision as an authoritative interpretation of that provision as long as the interpretation "does not violate the Constitution or a federal statute" and is not "plainly erroneous or inconsistent with" the provision's text. *Id.* at 45 (citations omitted); *see also United States v. Havis*, 927 F.3d 382, 386–87 (6th Cir. 2019) (en banc) (holding that because the list of controlled substance offenses in USSG § 4B1.2(b) does not contain attempt crimes, the gloss on "controlled substance offense" in the commentary, which includes attempts, is not a permissible "interpretation" of the Guidelines provision). *Havis* stated that "[c]ommentary binds courts only 'if the guideline which the commentary interprets will bear the construction.'" *Havis*, 927 F.3d at 386 (quoting *Stinson*, 508 U.S. at 46). Because application note 2 to § 4B1.3 explains the meaning of "engaged in as a livelihood" in a way that the text of the Guidelines provision will bear, rather than adding to a list or definition given in the text of the Guidelines provision, the application note is binding on federal courts under *Stinson* and *Havis*.

The prosecutor presented evidence that Buchanan had earned over $14,500, or 2,000 times the relevant minimum wage of $7.25, in less than a twelve-month period. Specifically, the government had estimated that Buchanan's net income from marijuana sales, over a period of eight months for which the government had data, was $384,000. The government arrived at this number by first subtracting $6,000 (a high-end estimate—based on evidence of wire transfers Buchanan had made that corresponded with package shipments—of how much he paid for each package of marijuana) from $30,000 (the low end of Adams's estimate of the value of the package of marijuana intercepted by law enforcement) to reach an estimated profit per package of $24,000. Then, the government multiplied $24,000 by 16—an estimate of the number of packages Buchanan was responsible for, based on his stipulation to responsibility for 79.2 kilograms of marijuana—to arrive at the $384,000 figure.

When the prosecutor presented this estimate of Buchanan's criminal income to the district court in support of the livelihood enhancement, the district court pointed out that Buchanan's PSR stated that he had been employed by his father's trucking company since 2008 and claimed to have earned $400 per week in that capacity. The district court then inquired, "Doesn't [the phrase "engaged in as a livelihood"] suggest that that's aimed at a Defendant who does nothing but criminal conduct?" R. 75, PageID 795. The prosecutor responded that the commentary to § 2D1.1 "says that you look then to 4B1.3 Note 2 for the definition of a livelihood. Not definition of a livelihood is simply—is not necessarily this totality, but it means 2000 times the federal minimum wage of $7.25 per hour."[3] *Id.* at PageID 795–96. After the district court inquired more about how the government had arrived at its estimate of Buchanan's criminal income, the district court asked defense counsel if he had any comment.

Defense counsel admitted that Buchanan had stipulated to the 79.2-kilogram figure but argued that he had not stipulated "to the value of any package." *Id.* at PageID 798. Thus, defense counsel argued that because the income attributed to Buchanan was based on an estimate, "I don't believe the Government can sustain a burden, even by a preponderance, that

---

[3]The government's sentencing memorandum also represented that the livelihood enhancement required only an amount-of-income finding and said nothing about the "primary occupation" prong.

there was a criminal livelihood here." *Id.* at PageID 798–99. Defense counsel did not make any arguments about the second element of the § 4B1.3 livelihood test, "primary occupation."

After asking more questions about the proper estimate of Buchanan's criminal income, the district court overruled Buchanan's objection to the livelihood enhancement. However, the district court stated that it believed the application of the enhancement was "a very close question" and that "the Government[] [had] very little evidence." *Id.* at PageID 804. Explaining its reasoning, the district court continued:

> I think that the Defendant had long time significant employment for more—approaching ten years of time. And so I think it's difficult to make a generalized claim that this drug dealing was engaged in as a livelihood, which the phrase from the Guidelines suggest[s] to me that livelihood refers to an almost independent occupation. But, under the Guideline you've pointed out and the commentary, I think there is sufficient evidence that he meets this minimum wage times 2000 hours requirement.

*Id.* at PageID 805. Later, in announcing Buchanan's sentence, the district court explained the factors it had considered under § 3553(a). On the subject of Buchanan's "history and background," the district court stated, "He has had a—what appears to be a good work record, working for his father. He earns a moderately reasonable amount of income in that [position]." *Id.* at PageID 831.

Based on this record, Buchanan argues that the district court made a factual finding that he had an extensive record of working at a company that paid him regularly. Buchanan does not now contest the district court's finding that he made criminal income of more than 2,000 times the minimum wage in a twelve-month period; instead, he argues that the district court improperly ignored the need to make a "primary occupation" finding and that such a finding would be at odds with the district court's statements about Buchanan's legitimate work history.

As the transcript portions quoted above show, the district court did make a factual finding—which we should not disturb except on a finding of clear error—about Buchanan's legitimate work history. The district court "may accept any undisputed portion of the presentence report as a finding of fact." *United States v. Denson*, 728 F.3d 603, 614 (6th Cir. 2013) (quoting Fed. R. Crim. P. 32(i)(3)(A)). Here, the government never objected to the

paragraph in Buchanan's PSR stating that he had worked at his father's company since 2008 and that "[a]ccording to the defendant and his father, the defendant earned $400 weekly." R. 49, PageID 296. Therefore, the district court did not err in accepting the information in that paragraph as fact and in crediting Buchanan's and his father's claims about his legitimate income.[4]

The transcript of the sentencing hearing also shows that the district court applied the enhancement under the impression that § 4B1.3 required only a finding of how much money the defendant had made from criminal activity. Because the commentary to § 4B1.3 makes clear that the district court must make two findings for the enhancement to apply, the district court erred in basing its application of the enhancement on only one of those findings.

Furthermore, the district court's error in interpreting the Guidelines was not harmless.

> There can be no harmless error unless the appellate court can determine from the record that the same sentence would be imposed on remand. For the government to carry its burden, it must demonstrate to the [c]ourt *with certainty* that the error at sentencing did not cause the defendant to receive a more severe sentence.

*United States v. Gillis*, 592 F.3d 696, 699 (6th Cir. 2009) (internal citations and quotation marks omitted); *see also United States v. Salyers*, 592 F. App'x 483, 486 (6th Cir. 2015) (finding that a four-level error in calculating the defendant's base offense level was not harmless because "[t]he district court did not indicate that it would have imposed the same 120-month sentence even if defendant's base offense level was 24").

---

[4]The government attempts to cast doubt on whether Buchanan really earned $400 per week working for his father's company by alluding to evidence that it learned of post-sentencing. *See* Appellee Br. at 37 n.6. However, the time for challenging the district court's factual finding on this matter has passed for the purposes of our appellate review. *See* Fed. R. Crim. P. 32(f)(1) ("Within 14 days after receiving the presentence report, the parties must state in writing any objections, including objections to material information, sentencing guideline ranges, and policy statements contained in or omitted from the report."); *see also Sovereign News Co. v. United States*, 690 F.2d 569, 571 (6th Cir. 1982) ("A party may not by-pass the fact-finding process of the lower court and introduce new facts in its brief on appeal."). Although the prosecutor mentioned in passing at the sentencing hearing that Buchanan's "bank records don't seem to show any pay checks coming in" that would corroborate Buchanan's claim of legitimate employment, the government did not object to the PSR on this basis. R. 75, PageID 795. Based on the un-objected-to statements in the PSR, the district court made a factual finding about Buchanan's legitimate employment that was not clearly erroneous.

Here, the enhancement resulted in a two-level addition to Buchanan's offense level, and the district court gave no indication that it would have given Buchanan the same sentence had his total offense level been calculated as 24 instead of 26. With a total offense level of 24, Buchanan's Guidelines range would have been only 51 to 63 months. *See* USSG Ch. 5, Pt.A. Indeed, the district court repeatedly referenced Buchanan's total offense level while announcing his sentence, and the district court noted that Buchanan's PSR listed the average sentence for a drug-trafficking defendant in criminal history category I as 55 months. Apparently assuming that that number applied to defendants with a total offense level of 28—two levels higher than Buchanan's—the district court mused that the average sentence was probably lower than 55 months for someone with a total offense level of 26. The district court then sentenced Buchanan to 50 months, a term of imprisonment thirteen months below the bottom of his Guidelines range and five months below the average sentence for what the district court believed to be a comparable defendant. In sum, the record demonstrates that the district court took Buchanan's total offense level very seriously in calculating his sentence and may well have sentenced him to a shorter term of imprisonment had it calculated his Guidelines range differently.

The government, however, urges us to affirm because Buchanan's purported criminal income of $384,000 (based on Adams's testimony) dwarfs his claimed legitimate income of less than $21,000. Crime was Buchanan's primary occupation, goes the government's argument, because it accounted for the vast majority of his income.

We decline to adopt the government's logic because it would require us to make two factual findings in the first instance. First, that crime was a defendant's "primary occupation" is a factual finding requiring a totality-of-circumstances approach. *See* USSG § 4B1.3, comment. (n.2). The district court did not make any such finding because it was unaware of the requirement. Second, to accept the government's position, we would also need to accept as a matter of fact that Buchanan's criminal income for the relevant period was $384,000. But there are reasons to doubt this estimate (for example, it was based not on evidence of Buchanan's actual sales but on one witness's opinion about the average value of a given quantity of marijuana in Cleveland). More importantly, the district court never made a factual finding on the record of exactly how much Buchanan's criminal activity profited him. Instead, the district court

merely found that Buchanan's criminal earnings exceeded 2,000 times the minimum wage during the relevant time period. At the same time, the district court reiterated that it found the application of the enhancement was "a close question" but that "a preponderance of the evidence" supported the government's position that Buchanan surpassed the threshold level of criminal income. R. 75, PageID 805. In fact, the district court may have credited only $14,500.01 of the government's estimate: that finding, on the district court's erroneous reading of § 4B1.3, would have triggered the livelihood enhancement.

As a reviewing court, we have no principled basis for accepting in total the government's evidence of Buchanan's criminal income when the district court did not. Instead, we are to review the district court's factual findings for clear error, *see Cole*, 359 F.3d at 425; if the district court failed to make a factual finding on a required element, we have no facts to review, and remand is the appropriate course of action, *see Pullman-Standard v. Swint*, 456 U.S. 273, 291–93 (1982).

On remand, therefore, the district court must analyze whether, under the "totality of circumstances," Buchanan's crimes were his "primary occupation." Relevant factors in this analysis may include an estimate of hours worked in each capacity as well as the amount of income earned in each capacity. No particular ratio of, or difference between, illegitimate and legitimate income automatically satisfies the "primary occupation" prong; to hold otherwise would ignore § 4B1.3's "totality of circumstances" language.[5] Of course, if the district court finds that Buchanan fits the description in either of the application note's two non-exhaustive examples—that of a defendant who "engaged in criminal conduct rather than regular, legitimate employment" or whose "legitimate employment was merely a front for the defendant's criminal

---

[5]*United States v. Kellams*, 26 F.3d 646, 649 (6th Cir. 1994) and *United States v. Reed*, 951 F.2d 97, 101–02 (6th Cir. 1991) do not affect our conclusion. In *Kellams*, we affirmed the application of the enhancement to a defendant who had net legitimate income of, at most, $4,268 and illegitimate income of $15,917.41 in the relevant time period. *See* 26 F.3d at 649. In *Reed*, we affirmed the application of the enhancement to a defendant who had legitimate income of $350 and illegitimate income of more than $17,000. *See* 951 F.2d at 101–02. In neither case did the defendant argue that the district court had failed to make the "primary occupation" finding. Unlike here, in each case we were reviewing a district court that had applied the correct legal standard and made factual findings thereunder. Reviewing these factual findings, both opinions noted the "totality of circumstances" language in the application note to § 4B1.3 and held that the district court had not erred in applying the enhancement. *See Kellams*, 26 F.3d at 649; *Reed*, 951 F.2d at 101–02. Appropriately, neither opinion announced a hard-and-fast rule for determining what proportion of illegitimate income triggers the enhancement.

conduct"—the district court may apply the enhancement, given that it has already found the 2,000-times-minimum-wage prong is satisfied. *See* USSG § 4B1.3, comment. (n.2).

Finally, both the government and Buchanan may present new evidence on remand regarding whether crime was Buchanan's "primary occupation." *See United States v. Doutt*, 926 F.3d 244, 248 (6th Cir. 2019) ("When a district court applies the wrong legal standard at sentencing, the government may introduce additional evidence on remand that comports with the appropriate legal standard." (citation omitted)); *cf. United States v. Baker*, 559 F.3d 443, 455 & n.10 (6th Cir. 2009) (holding that on remand, the government was entitled to present new evidence in support of the defendant's designation as a career offender because the case announcing the relevant standard had not yet been decided at the time of sentencing).

## III.  CONCLUSION

For the foregoing reasons, we **AFFIRM** Buchanan's conviction but **VACATE** his sentence and **REMAND** for resentencing.  On remand, the district court is instructed to revisit the applicability of the livelihood enhancement under the correct legal standard.