NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0338n.06

Case No. 19-6038

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jun 10, 2020
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE MIDDLE DISTRICT OF |
| BRENDA MONTGOMERY, | ) | TENNESSEE |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

BEFORE: MOORE, SUTTON, and WHITE, Circuit Judges.

SUTTON, Circuit Judge. Brenda Montgomery's fraudulent Medicare kickback scheme generated millions of dollars in revenue and 42 months in prison. In objecting to her sentence, she argues that the district court misapplied an aggravating role enhancement under § 3B1.1(a) of the Sentencing Guidelines. She is right. But because the court stated it would reach the same (below-guidelines) sentence even without this mishap, we find the error harmless and affirm.

In 2007, Brenda Montgomery founded CCC Medical Equipment. As the company's CEO, she coordinated the sale of "durable medical equipment," which includes knee and back braces, nerve stimulation devices, and the like. ROA at 7, 9. The business thrived. She had plenty of customers, and she expanded to five storefronts in Tennessee.

But part of the success arose from Medicare fraud. In 2008, she connected with John Davis, the CEO of Comprehensive Pain Specialists, a medical service provider involved in pain management. The two agreed that Davis would lean on his employees to refer patients to

Montgomery for their durable medical equipment needs. One source of pressure was that Davis would pay his employees incentive bonuses for each patient they sent her. Montgomery would then sell the patients equipment, knowing that Medicare would pick up most of the tab. And she would pay Davis a kickback for his efforts, at least 60% of the profits she made from each referred patient. To disguise the scheme, Montgomery hired Davis's wife as an "independent contractor" and channeled the money through her.

Between June 2011 and June 2017, Montgomery made over $4 million on referrals from Davis. Nearly half of the money came from Medicaid reimbursements. Davis did well too. He received over $750,000 in kickbacks. The two prepared fraudulent tax forms alleging that Davis's wife performed "contract services" for Montgomery. When they felt the need to "do the[ir] checks different[ly]" to evade detection, they transferred $150,000 through the sham sale of a valueless shell company named "ProMed Solutions." *Id.* at 12.

The U.S. Department of Health and Human Services grew suspicious. With the help of the Tennessee Bureau of Investigation, it uncovered the scheme. Montgomery pleaded guilty to one count of conspiracy to violate the anti-kickback statute and conspiracy to defraud the United States, 18 U.S.C. § 371, and seven counts of paying kickbacks in relation to a federal healthcare program, 42 U.S.C. § 1320a-7(b).

The key issue at sentencing was whether Montgomery deserved a four-level enhancement for an "[a]ggravating [r]ole" in the offense. U.S.S.G. § 3B1.1(a). Montgomery objected, insisting she had not acted as an "organizer [or] leader." *Id.* cmt. n.2. The presentence report found that Montgomery shared equal responsibility with Davis, concluded she did not act as an organizer or leader, and recommended against applying the increase.

The court reached a different conclusion. After a lengthy colloquy with the parties, it adopted the presentence report's finding that she did not lead or organize the scheme. "At best," the court found, Montgomery and Davis "were partners in this." R. 300 at 39. Even so, the court wondered if it could apply the enhancement based on the "otherwise extensive" nature of Montgomery's criminal enterprise. *Id.* at 39–40. Noting that this was the "most difficult" issue in the case, it opted to apply the enhancement on this basis. *Id.* at 39. That yielded a guidelines range of 78 to 97 months, as opposed to 51 to 63 months without the enhancement.

Turning to the § 3553(a) factors, the court noted that Montgomery's actions showed a clear disrespect for the law. *Id.* at 62. But it acknowledged that she has had a "positive impact on many lives," *id.*, that she has no criminal history, and that her age (71 years old) and "health issue[s]" would make a prolonged sentence especially onerous, *id.* at 64. In the end, it reduced the sentence to 42 months. And it stated that it would have "imposed the same sentence under § 3553(a)" even if the "guideline[s] calculation is determined to have been wrong." *Id.* at 68.

On appeal, Montgomery argues that the court misapplied the § 3B1.1(a) aggravating role enhancement. She is right. Because Montgomery did not lead or organize anyone, § 3B1.1(a) does not apply. *United States v. Christian*, 804 F.3d 819, 824 (6th Cir. 2015).

But that does not end the appeal. We still must affirm her sentence if the "error at sentencing did not cause [her] to receive a more severe sentence" than she otherwise would have gotten. *United States v. Gillis*, 592 F.3d 696, 699 (6th Cir. 2009). When "the record shows that the district court would have imposed its sentence regardless of the Guidelines range," we may conclude that any "error in calculating the Guidelines range is harmless." *United States v. Morrison*, 852 F.3d 488, 491 (6th Cir. 2017).

In this case, it helps that the court recognized the potential error in applying the enhancement. It explained that it "would have imposed the same sentence under § 3553(a)" even "[i]f the guideline[s] calculation is determined to have been wrong." R. 300 at 68. We have found similar errors harmless based on similar declarations. *See, e.g.*, *Morrison*, 852 F.3d at 491–92; *United States v. McCarty*, 628 F.3d 284, 294 (6th Cir. 2010); *United States v. Obi*, 542 F.3d 148, 156 (6th Cir. 2008); *United States v. Ward*, 506 F.3d 468, 477 (6th Cir. 2007); *United States v. Cobb*, 766 F. App'x 226, 231 (6th Cir. 2019); *United States v. Steel*, 609 F. App'x 851, 854–55 (6th Cir. 2015).

Nor is there any good basis for doubting that the court had the § 3B1.1(a) enhancement in mind when it contemplated the possibility of a mistaken guidelines calculation. It disposed of the other contested issues in the case swiftly and without doubt, taking less than two full transcript pages. By contrast, it flagged the § 3B1.1(a) enhancement as "[t]he most difficult" issue—and one that took a different path from the presentence report. R. 300 at 39. Its discussion of the enhancement took six transcript pages.

Other features of the sentencing hearing reinforce the view that the court would have reached the same result even without the guidelines error. The court emphasized the § 3553(a) factors, analyzing them at length and labeling them the "important part" of its sentencing analysis. *Id.* at 37. Evidence of its reliance abounds. This is not a case where a court first announced a percentage-based variance and then rotely applied it to a set guidelines range. The court identified a reasonable sentence under the § 3553(a) factors and worked to explain how arriving at that sentence justified a (substantial) downward variance.

Montgomery responds that the cited cases involve courts that "considered the correct guidelines [range]" before going the wrong way. Reply Br. 3. But it's hard to see why the

sequencing makes a difference so long as the court acknowledged the possibility of an error and announced the alternative sentence. Nor is it fair to say that the court's comments failed to show an appreciation of what it was doing. It identified the § 3B1.1(a) aggravating role enhancement as the "most difficult" issue and subjected it to singular scrutiny. R. 300 at 39. It then performed the "mathematic[al] exercise" of determining the enhancement's possible effects on Montgomery. *Id.* at 37. And after that it explained, at length, why the § 3553(a) factors called for a below-guidelines sentence and why they would continue to do so even if it got the enhancement wrong.

Montgomery claims that two cases call for a different conclusion: *United States v. Buchanan*, 933 F.3d 501 (6th Cir. 2019), and *United States v. Salyers*, 592 F. App'x 483 (6th Cir. 2015). But in *Buchanan*, the district court "gave no indication that it would have given the [defendant] the same sentence" under a different guidelines range. 933 F.3d at 517. Quite the contrary: The sentencing court made clear that it took the defendant's "total offense level very seriously" in its final calculus. *Id.* The same goes for our unpublished opinion in *Salyers*, a case in which the court "did not indicate that it would have imposed the same sentence" under a different guidelines range. 592 F. App'x at 486.

Montgomery adds that her sentence fell 54% below the miscalculated guidelines range and that she would have received 27 months, not 42 months, if the court applied the same percentage decrease to the correct range. That reality explains why we routinely remand for new sentencing hearings when the district court miscalculated the sentencing range. But the argument has no purchase when the court acknowledges the possibility of error and says it would have given the same sentence either way.

We affirm.